**James F. HULL, Appellant,**

v.

**The STATE of Texas, Appellee.**

**NO. 59699.**

Court of Criminal Appeals of Texas, Panel No. 2.

March 11, 1981.

Rehearing Denied April 22, 1981.

---

**736**

Albert A. Pena, III, Corpus Christi, for appellant.

Arthur C. Eads, Dist. Atty., Ralph Petty, Jr., Asst. Dist. Atty., Belton, Robert Huttash, State's Atty., Austin, for the State.

Before DALLY, W. C. DAVIS and CLINTON, JJ.

## OPINION

CLINTON, Judge.

Appeal is taken from a conviction for the offense of possession of more than four ounces of marihuana; the punishment assessed was three years, probated.

Appellant contends only that the trial court erred in denying his motion to suppress the marihuana seized from the trunk of an automobile he was operating, and admitting the contraband into evidence during the prosecution against him. For reasons about to be delineated, we agree, and must therefore reverse appellant's conviction.

The evidence adduced at the hearing convened upon appellant's motion to suppress established that on the evening of August 23, 1977, approximately sixteen officers, representing various State and local law enforcement agencies, were in "the vicinity" of a 70 acre ranch or farm located five miles out of Lampasas; the surveillants, divided into four groups of approximately four officers, were biding the time, anticipating the return of one of their number with a warrant authorizing a search of the fenced, 70 acre premises, including the house and outbuildings.[1] During this wait, Deputy Sheriff Richard Miles was, along with two others identified only as Officers Gant and Garcia, stationed at the entry gate of property adjacent to the suspected property[2] on Center City Road.

1. Specifically, the primary object of the officers' interest, was a large greenhouse of which a five week observation—by means of binoculars and a night vision scope—had revealed "what appeared to be green plants growing inside." This, coupled with information that any trespasser on the fenced property would be met by an occupant of the house, and the fact that the greenhouse, located 100 yards from the house, was separately fenced, led local law enforcement officers to borrow a 35 millimeter camera with a 600 millimeter telephoto lens attachment, in order to peer into a 4 inch by 4 inch louver on the greenhouse which opened when a thermostatically controlled fan was activated. By means of this camera equipment, the officers' suspicions that marihuana was being tended, were confirmed, and at approximately 6:00 p. m. on the day in question the search warrant was sought by one officer McClinton.

While the briefs before us address at some length the legality of this activity, it is of no consequence to disposition of this case, so we leave that problem to be resolved in related cases in which others apprehended on the suspected property were convicted, namely *Wheeler*, our Cause No. 59,804; *Guynn*, No. 59,805; *White*, No. 59,806.

2. The record reflects that the suspected property was approximately one half mile off Center City Road, a public thoroughfare, and, being "land locked," road access to it was provided by an easement through neighboring property which, in fact, practically encircled it.

From this vantage point, the officers could see neither the property nor the house on it; Deputy Miles testified he had never been there, and thus did not know exactly where it was in relation to his position. Nevertheless, Miles stated that he heard four gun shots that "in his opinion and to the best of his recollection" came from the direction of the suspected property, at approximately 8:00 p. m. According to Miles, he at this point attempted to contact another group of officers who were working "undercover" in the area; [3] simultaneously, two other broadcasts to the undercover officers went out, but to no avail.

At approximately 8:10 p. m., Miles saw a car travelling slowly inside the neighboring property toward the gate where he was stationed. He radioed the Sheriff to report this, and was instructed to stop the vehicle. According to Miles, his reason for stopping the car and its occupants was to investigate the gun shots he had heard.

As the vehicle approached the gate and pulled to a stop, the passenger—later identified as Jim Ganther—exited the vehicle, closed the door, walked to the gate, opened and held it as appellant drove the car through and stopped on the other side. Ganther was walking back toward the passenger door when the three officers appeared, their weapons trained on the men, and Miles instructed, "Freeze. Don't move."

Ganther was immediately frisked; appellant, who had exited the car and closed the door to the driver's side was also subjected to an outer clothing search. Finding no weapons or contraband on either man, the officers asked "who they were." When neither appellant nor Ganther would "say anything," the officers put handcuffs on them and led them to the patrol car.

At this point, the keys to appellant's car were obtained from the ignition and the trunk was opened. Inside, a large quantity

of marihuana was found. As the officers searched the inside of the car, Officer Gant "went under" the front seat and recovered a .44 caliber magnum pistol on the driver's side.

According to Deputy Miles, when he stopped appellant and Ganther his "main intention was to check and see if there were any bodies in the trunk of the car,"[4] because he was "in fear of the lives of the other officers that were undercover." But he also stated that appellant and Ganther were placed under arrest for "failure to identify" themselves, and the car was then searched including the trunk, pursuant to normal "procedure when we stop a vehicle and apprehend someone."

Miles conceded that the men were travelling at a safe speed and neither appeared to be in a big hurry nor frightened; nor did the officers observe any suspicious movement or activity on the part of the occupants of the vehicle they stopped. Miles further testified that at the time of the stop, he was not aware of any violation of the law having been committed, and was aware he had no warrant authorizing the search which ensued. When asked whether he had observed any traffic violations, Miles exclaimed,

"A: Sir, it was a suspicious vehicle under suspicious circumstances.

Q: What was so suspicious about this vehicle?

A: Sir, *the shots being fired.*[5]

Q: But it's not against the law for shots to be fired?

A: No, sir.

\*  \*  \*  \*  \*  \*

Q: Why was it such a suspicious car? *Because it was coming down this driveway?*

A: *Yes, sir.*

Q: *Any car coming down the driveway would be suspicious?*

---

3. Miles explained that in this context, "undercover" meant that the officers were "hidden" and thus, depended on "walkie-talkies" for communication with the others.

4. At another point, however, Miles testified that he and the others were looking for weapons in the trunk.

5. Emphasis throughout is supplied by the writer of this opinion unless signified otherwise.

A: *Yes, sir.*

Q: Any car?

A: Yes, sir.

\*   \*   \*   \*   \*   \*

Q: You would have stopped every car coming out that driveway?

A: Yes, sir, I would have.

Q: Without any probable cause, without anything, *you would have stopped every car?*

A: Yes, sir.

Q: Without shots being fired?

A: Sir?

Q: *Without shots being fired?*

A: *Yes, sir.*

Thus, assuming that the factual sequence related by Deputy Miles suggests a "Terry-type" seizure of appellant and his companion by the officers (as opposed to their instantaneous arrest which would, of course, require probable cause) we initially consider whether that seizure and the ensuing search were reasonable under the circumstances.[6]

In *Delaware v. Prouse*, 440 U.S. 648, 653–654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979), it was observed,

"The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials including law-enforcement agents, in order 'to safeguard the privacy and security of individuals against arbitrary invasions...'"

Therefore, continued the Court, "the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Delaware v. Prouse*, supra, at 654, 99 S.Ct. at 1396; see also *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 880 (1968):

"Implemented in this manner, the reasonableness standard usually requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against 'an objective standard,' [irrespective of] whether this be probable cause or a less stringent test." *Delaware v. Prouse*, supra, at 654, 99 S.Ct. at 1396.

So, as early as the Supreme Court's pronouncements in *Terry v. Ohio*, supra, it was mandated that in order to justify an intrusion "by means of physical force or show of authority,"[7] however slight it might be, the officer involved "must be able to point to *specific and articulable facts* which, taken together with rational inferences *from those facts*, reasonably warrant that intrusion." *Terry v. Ohio*, supra, 392 U.S. at 21, 88 S.Ct. at 1879. And Chief Justice Warren there noted that "[t]his demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." *Id.*, n. 18.

Contemporaneous with the above pronouncements, the Court explicitly disapproved "intrusions upon constitutionally guaranteed rights based on nothing more

---

**6.** This inquiry was characterized by the Supreme Court of the United States as "a dual one," including,

"whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968).

Though *Terry v. Ohio*, supra, is often read as approving an "investigative stop," pertinent language in its note 16 disclaims that result, *viz*:

"We thus decide nothing today concerning the constitutional propriety of an investigative 'seizure' upon less than probable cause for purposes of 'detention' and/or interrogation. Obviously, not all personal intercourse between police and citizens involves 'seizure' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."

**7.** See *Terry v. Ohio*, supra, at 19, n. 16, 88 S.Ct. at 1878.

substantial than *inarticulate hunches ...,*" elaborating that "simple ' "good faith on the part of the arresting officer is not enough." * * * If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be "secure in their persons, houses, papers and effects," only in the discretion of the police.' *Beck v. Ohio,* 379 U.S. 89, 97, 85 S.Ct. 223, 229, 13 L.Ed.2d 142 (1964)." *Terry v. Ohio,* supra, 392 U.S. at 22, 88 S.Ct. at 1880.

That a generalized suspicion will not suffice, is no longer open to debate.[8] For the most recent, as well as potent, affirmation in this regard to date has been made in *United States v. Cortez,* —— U.S. ——, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Speaking for the unanimous Supreme Court, Chief Justice Burger observed that the variety of terms employed by courts "to capture the elusive concept of what cause is sufficient to authorize police to stop a person[9] * * * are not self-defining." —— U.S. at ——, 101 S.Ct. at 695. With that introduction, the Court set out to provide "clear guidance dispositive of the myriad factual situations that arise." *Id.*

Common to all written on the subject, is the notion that on consideration of the totality of the circumstances—shorthanded by the Court as "the whole picture"—the detaining officers must have a "*particularized* and objective basis for suspecting the *particular person* stopped of criminal activity." [10] *Id.*

"The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. *First, the assessment must be based upon all of the circumstances.* The analysis proceeds with various objective observations.... * * *

The process does not deal with hard certainties, but with probabilities * * * Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

*The second element* contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that *the particular individual being stopped* is engaged in wrongdoing." *Id.*

With these principles in mind we are constrained to conclude that Deputy Miles and his colleagues had no objective, particular-

---

**8.** In *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), "the Court analogized the roving-patrol stop to the on-the-street encounter addressed in *Terry v. Ohio,* supra, and held that:

'Except at the border and its functional equivalents, officers on roving patrol may stop vehicles *only* if they are *aware* of specific articulable facts, together with rational inferences from those facts that reasonably warrant suspicion *that the vehicles contain aliens who may be illegally in the country.*' 422 U.S. at 884, 95 S.Ct. at 2574 [footnote omitted]."

*Delaware v. Prouse,* supra, 440 U.S. at 655–676, 99 S.Ct. at 1397.

Later, invoking *Terry v. Ohio,* supra, the Court in *Delaware v. Prouse,* supra, at 663, 99 S.Ct. at 1401, observed that "people are not shorn of all Fourth Amendment protection when they *step from their homes onto the public* sidewalks. [Neither] are they shorn of those interests when they step from the sidewalks *into their automobiles.*"

And condemning the "standardless and unconstrained discretion" in stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile, the Court reasoned,

"When there is not probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations—nor other articulable basis amounting to reasonable suspicion *that the driver is unlicensed or his vehicle unregistered*—we cannot conceive of any legitimate basis upon which a patrolman could decide that stopping *a particular driver* for a spot check would be more productive that stopping any other driver."

*Delaware v. Prouse,* supra, at 661, 99 S.Ct. at 1400.

**9.** The terms mentioned by the Court: "articulable reasons" and "founded suspicion."

**10.** A corollary to this is that the "criminal activity" suspected, must likewise be "particularized." See n. 8, *ante.* Accord *Armstrong v. State,* 550 S.W.2d 25 (Tex.Cr.App.1976).

ized basis whatever for suspecting appellant of having murdered or secreted the bodies of one or more undercover officers in the trunk of the car, as he claimed. *United States v. Cortez*, supra.

According to Miles, "the whole picture" included his knowledge that "the purpose of the surveillance ... was for narcotics," "a large amount" and "there were more than one subject" involved in "the alleged control or possession of this narcotic;" these facts, coupled with his knowledge that "after the shots were fired we were not able to raise [the undercover officers] by radio" created a "fear that their lives may have been in jeopardy." But Miles candidly admitted,

> "The reason I stopped the vehicle was because I did hear shots and after the shots were fired the Sheriff, I had informed the Sheriff that the car was coming out and the Sheriff said stop the vehicle."

Notwithstanding the long term surveillance of the suspected property, neither Miles, nor any other officer called by the State, had ever observed appellant or his vehicle thereon. Moreover, Miles testified, upon confronting appellant and Ganther neither he nor the others asked whether the men had heard any shots, or made any other reasonable inquiries.

In fact, we think it clear from the record made on appellant's motion to suppress that the sixteen law enforcement officers positioned "in the vicinity" of the suspected 70 acre tract, had that property, as well as property surrounding it, besieged. The apparent intent of Miles and the others as they waited for issuance of a search warrant, was to stop *any* vehicle which came down that road, before they were able to secure and execute that warrant, simply because it travelled that road. The Sheriff

had authorized and ordered as much. When appellant's vehicle appeared, the officers did not want it to "get away;" Miles testified he would have stopped *any* car, even if he had heard no shots.

Furthermore, at the very least, insistence upon "any quantum of individualized, articulable suspicion," *Delaware v. Prouse*, supra, 440 U.S. at 661, 99 S.Ct. at 1400, dictates that some indication from appellant and Ganther be sought, that their objectively innocent activity was "related to crime" before the officers were warranted in demanding that they identify themselves. *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).[11]

Because we have found that the officers' conduct in detaining appellant was without a particularized and objective suspicion of criminal activity on his part, we must hold that the arrest of appellant which ensued when he refused to identify himself, was violative of the Fourth Amendment.[12] *Brown v. Texas*, supra.

Clearly, also, the marihuana obtained as a result of these impermissible acts of the police, must be suppressed, and the trial court's failure to exclude its admission into evidence constituted reversible error. See *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); and *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

The judgment of conviction is reversed, and this cause is remanded to the trial court.

---

11. As the Supreme Court observed in *Brown v. Texas*, supra, 99 S.Ct. at 2641,

> "The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that *appellant himself* was engaged in criminal conduct."

12. Thus, like the Supreme Court, "we need not decide whether an individual may be punished for refusing to identify himself in the context of a lawful investigatory stop which satisfies Fourth Amendment requirements." *Brown v. Texas*, supra, 443 U.S. at 51, 99 S.Ct. at 2641, n.3. [See V.T.C.A. Penal Code, § 38.02.]