Bobby Lee BEASLEY, Appellant,

v.

The STATE of Texas, Appellee.

Donald Ray BEASLEY, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 61770, 61771.

Court of Criminal Appeals of Texas, Panel No. 1.

Sept. 15, 1982.

Rehearing Denied July 18, 1984.

Randolph C. Chandler, Stephenville, for appellant.

Robert J. Glasgow, Dist. Atty., and Robert S. Lee, Asst. Dist. Atty., Stephenville, Robert Huttash, State's Atty., and Alfred Walker, First Asst. State's Atty., Austin, for the State.

Before ODOM, TOM G. DAVIS and CLINTON, JJ.

## OPINION

CLINTON, Judge.

Appeals are taken from convictions for aggravated robbery obtained in a single trial; each appellant's punishment was assessed at life confinement pursuant to V.T. C.A. Penal Code, § 12.42(d).

By ground of error five, each appellant alleges his written inculpatory statement was a product of his illegal detention arising from an unreasonable warrantless arrest. We are constrained to reverse both convictions under this contention.

The record reflects each appellant filed a motion to suppress evidence which contained an allegation comporting with their fifth grounds of error on appeal. It was determined at a pretrial hearing that the State would undertake its burden of prov-

ing the arrests of appellants were lawful, during trial on the merits.

As best as we can determine from the testimony of Officer R.D. Bowers[1] the salient facts follow: On October 25, 1978, at approximately 6:30,[2] Bowers and his partner, Officer Peters, received "a radio call of suspicious people" being in a residential area of Mesquite in Dallas County. Arriving approximately simultaneously with another squad car containing Officer Perkins, Bowers pulled up head on to a pickup truck parked legally on the right side of the road. Appellants were standing at the rear of the truck, the doors of which were closed, the hood of which was ajar. The area was dark, Bowers remarked, with trees on each side.

Exiting the car, Officers Bowers and Peters walked up to appellants, requested identification and asked their purpose in being where they were. Both appellants produced a driver's license, and Bowers handed them over to Peters, who went back to the squad car "to do the checks." Appellants explained that they were electricians on their way to work, but the clutch in the pickup "burned out" and the motor was causing trouble. They were waiting for someone already in route to help them.

As this conversation was taking place appellants, with Bowers, walked along side the pickup and reentered it. Bowers testified that "when they were inside the truck, *we* were running a check on the license of the pickup,"[3] but since he later said, "*I* ran

the twenty-eights and twenty-nine's"[4] we take his meaning to be that he stepped away from the pickup and one or another officer remained, later to be rejoined by Bowers. Everyone was just carrying on a conversation while appellants were sitting inside the pickup "and the N.C.I.C. hit came back on them."[5] He later explained that the N.C.I.C. indicated "known offenders," but never elaborated on what that term meant.

The next thing we glean from the testimony is that, after about ten to fifteen minutes inside, the appellants were somehow *outside* the pickup, and in front of it "sitting there talking with the officers," apparently awaiting a return on the "twenty-nine,"[6] the inquiry for which required the VIN. Officer Bowers testified he had obtained it from "off the inside section of the cab, it's a plate that is riveted to the cab wall." From the testimony it is impossible to determine at exactly what chronological point Bowers came into possession of the pickup's VIN, but he denied that *he* had opened a door to the pickup to get it, asserting, "the door was open."[7]

At any rate, according to Bowers:

"We were sitting there talking and they [appellants] asked for some cigarettes out of the vehicle, and at that time, we'd had some information from the computer [that they were known offenders] and I walked back to the side of the pickup, on the passenger side, and opened the door,

---

1. Though the record indicates two other officers, identified only as Peters and Perkins, were present during the entire transaction which culminated in appellants' arrests, neither was called by the State to testify.

2. Whether this was in the morning or evening, we are not informed, but the record as a whole seems to indicate it was the beginning of a work day in the darkness of late October.

3. All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

4. Code "ten twenty-eight" is for registration of a motor vehicle; "ten twenty-nine" requests information about whether the vehicle is reported stolen, based on the license plate number and the vehicle registration number (VIN), the serial

number assigned and affixed by the manufacturer of the vehicle.

5. National Crime Information Center.

6. The "ten twenty-eight" reported that the license plate on the pickup was registered to appellant Donald Beasley.

7. It will be recalled that darkness of the area as he and Peters first approached appellants was mentioned by Bowers, and given the small size of characters on a VIN plate one is left to wonder if the movement of appellants from inside to outside the pickup was related to his obtaining the VIN from the "fire wall" on the left, or driver's side of the cab.

and [in plain view, there was a gun case laying in the floorboard]."

Bowers described the gun case as a brown suede leather "zip-up type" case. He conceded that he could not see through it and did not know whether it contained a weapon until he picked it up, opened it and removed a "twenty-two automatic."

Both appellants were placed under arrest for unlawfully carrying a weapon.[8] They were taken to the Mesquite City Jail and the truck was impounded.

Apparently appellants were moved to the Dallas County Jail sometime between the day of their arrests and October 28, 1978, because the State established that on the latter date appellants received a visit there from David Ward, an investigator for the district attorney for Erath County. Appellants were advised of their rights and ultimately gave written statements incriminating themselves in commission of the offense for which they were convicted and have brought the instant appeal.

Appellants now insist the State failed to establish their arrests, made without a warrant, were lawful. We agree.

It is apparent that Officer Bowers, et al, proceeded to the location of appellants' breakdown in order to investigate the unremarkable presence of appellants who were legally parked in a residential neighborhood. The State has never asserted the officers possessed any particularized and objective basis for suspecting these appellants were engaged in any particular criminal activity, which would have justified the issuance of a warrant for their arrests by a detached magistrate, *or* justified a less intrusive "seizure" based on suspicion which would warrant the officers' "investigation" or demand that they identify themselves. *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); see also *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889

(1968); *Hull v. State,* 613 S.W.2d 735 (Tex. Cr.App.1981).

Thus, the first inquiry to be made is whether, under the totality of the circumstances proved, appellants were "seized" by the officers within the meaning of the Fourth Amendment to the United States Constitution and Article I, § 9, of the Texas Constitution.

Clearly, the fact that appellants' vehicle was disabled and therefore "already stopped when the officers arrived," has no probative force in resolution of the question. *Ebarb v. State,* 598 S.W.2d 842, 849 (Tex.Cr.App.1980)(Opinion on State's Motion for Rehearing). As was observed by the Court in *Ebarb,* supra,

"In the law of search and seizure the term 'stop' means something other than 'halt;' it refers to a type of temporary detention for investigation. The 'stop' was put in its constitutional framework in *Terry v. Ohio,* [supra, 392 U.S. at 16, 88 S.Ct. at 1877]: 'It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has "seized" that person.' It matters not whether the person was moving or standing still when the police officer accosted him; what matters is that the person was then restrained in his freedom to move. Thus, when a person is sitting in a parked car and a police officer orders him to roll down the window or to open the door, there is at that point a temporary seizure for investigative detention—a 'stop.' *State v. Smith,* 137 Ga.App. 101, 223 S.E.2d 30 (1975). A 'stop' is a seizure that is less intrusive than a full arrest, just as a 'frisk' is a pat down for weapons that is less intrusive than a search for evidence."

598 S.W.2d at 849–850.

While it might be inferred from the scant record before us that the initial arrival of two patrol cars containing three apparently uniformed police officers, one parking "eye to eye" with appellants' truck

---

**8.** Though far from clear, it was sometime after this point that the check on the VIN of the truck came back reporting the vehicle as stolen, for

Bowers was careful to state that the arrests occurred prior to his receipt of the information on the VIN.

and the other positioned behind, constituted a "seizure" of appellants at that moment, we are reluctant to resolve the issue on this circumstance alone. For, though little is clear from this record, it does establish that at a later point appellants were in fact "detained" by the officers to the extent that they had to "ask" for cigarettes from the truck, and Officer Bowers, for his "own safety," felt an appropriate response to this request was that *he* should go to the passenger's side, open the door and go into the vehicle for them.

The record makes manifest that at this point, the information within the officers' knowledge was that appellants' truck, legally parked in a residential area, had malfunctioned; appellants were electricians on their way to a job; they were apparently cooperative, readily answering questions and providing proof of their identities; the license of the truck was registered to one appellant; and both were reported to be "known offenders."[9] Just that is far short of facts which would justify a "seizure" of any sort recognized as reasonable under the Fourth Amendment. *Hull,* supra. Since there was no justification for appellants' detention, it follows Bowers' own action in opening the door and entering the truck was unreasonable, and the State may not therefore successfully rely on the "plain view doctrine." *Ebarb,* supra, (Opinion on Original Submission).

Neither will this record support a conclusion that the computer check on the VIN which subsequently revealed the truck to be stolen, [see n. 8, *ante* ] justified appellants' arrests nevertheless. The record is devoid of evidence indicating the circumstances under which the VIN was in the first instance obtained from inside the cab. Thus, the State's failure to develop the facts in this regard leaves that party's burden of proof unmet; what remains is the glaring inference that, at a minimum, the VIN, like the automatic weapon, was obtained as a result of appellants' illegal detention. Cf. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) [wherein finding heroin held not to justify initial illegal arrest].

Accordingly, we hold the State has failed to prove appellants' arrests without a warrant were reasonable.

Having determined appellants' arrests were in violation of the Constitution and the law of this State, as well as the Fourth Amendment to the Constitution of the United States, the question remains: whether the connection between appellants' unauthorized arrests and their inculpatory statements obtained during the period of their illegal detention was sufficiently attenuated to permit the use of those statements at trial? *Taylor v. Alabama,* 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); and *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Green v. State,* 615 S.W.2d 700 (Tex.Cr.App.1981).

A hearing on appellants' motions to suppress their written confessions was conducted outside the presence of the jury. At this hearing, Investigator Ward testified that on October 28, 1978, he had short[10] individual visits with each appellant, starting with Donald Beasley, in the Dallas County Jail. According to Ward, in each interview he advised appellants of their rights, satisfied himself those rights were understood and asked whether appellants would waive their rights and "talk to [him] surrounding the circumstances in which [they] became [sic] in possession of some of the stuff that was taken out of the aggra-

---

9. The conclusionary term is terribly ambiguous and the computer data producing "a hit" is notoriously incomplete, often out of date, based as it is on tenuous hearsay information. *Gassett v. State,* 532 S.W.2d 328, 330–331 (Tex.Cr.App. 1976).

But even if reliable evidence that one or both appellants were in fact convicted felons had been provided the officers, this, together with all other circumstances shown, would not authorize the "seizure" made here either.

10. We say "short" because, according to Ward, he had obtained finished typed statements after only approximately two hours from the initial confrontations with appellants.

vated robbery." [11] According to Ward, each appellant readily agreed to waive his rights and discuss the offense and this, without promises, threats, offers of clemency or reward being made.

In *Brown v. Illinois,* supra, the Supreme Court of the United States clarified the notion that application of the exclusionary rule to a confession in effectuating the Fourth Amendment, serves policies and interests different from those advanced by the Fifth Amendment. The Court identified a finding of "voluntariness" as merely a "threshold requirement" for Fourth Amendment analysis; later, in *Dunaway v. New York,* supra, the Court elaborated: "Indeed, if the Fifth Amendment has been violated, the Fourth Amendment issue would not have to be reached." 99 S.Ct. at 2259. See also *Taylor v. Alabama,* supra; *Green,* supra.

■ In the case before us, the trial court found that appellants each were warned of their constitutional rights and thereafter gave incriminating statements voluntarily. These findings are supported by the record and we accordingly defer to them.[12] *Green,* supra; *McKittrick v. State,* 541 S.W.2d 177 (Tex.Cr.App.1976).

Having determined these confessions were voluntary as a "threshold requirement," we now turn to the Fourth Amendment analysis prescribed by *Dunaway v. New York* and *Brown v. Illinois,* both supra, in order to determine whether the State has met its burden of establishing that these confessions were not the product of appellants' illegal arrests and detentions.

■ As identified in *Brown v. Illinois,* supra, and reiterated in both *Dunaway v. New York* and *Taylor v. Alabama,* supra, the factors, beyond Fifth Amendment "voluntariness," to be considered in determining the issue, are: (1) the temporal proximity of the arrest and the confession; (2) the presence of intervening circumstances; and, (3) the purpose and flagrancy of the official misconduct.

■ The only relevant data encompassed by these factors which is self-reporting under our record is the time interval between the arrests and the confessions: approximately two and one half to three days. The record, however, on these other issues is even less developed than it was upon the initial encounter between appellants and law enforcement officers, which culminated in the arrests. While the record suggests Investigator Ward in some way confronted appellants with the facts related in n. 11, *ante,* no elaboration whatever is offered. We are not even informed of when or why appellants were transported to the Dallas County Jail; neither does the record reveal any other event, or lack thereof, which occurred in the interim. Thus, as to intervening events of significance, the record is essentially silent.[13] Compare *Taylor v. Alabama,* supra. Further, the "purpose and flagrancy" of the initial illegal detention of appellant bodes ill for the State: without probable cause and on the basis of nothing more than a "suspicious persons" report, the officers set out on a patently investigatory mission. Then, on the basis of nothing more, appellants were detained in the apparent hope that "something

11. Earlier testimony adduced before the jury established that after the truck appellants had been driving on the day of their arrests was impounded, it was returned to its owners who, in fixing it and cleaning it out, discovered a shotgun under the hood and a sack of credit and identification cards inside the cab. These items were turned over to the police and ultimately made their way into the possession of Investigator Ward. The cards were shown to have belonged to the various victims of the aggravated robbery for which appellants were here convicted.

(As a matter of interest, after the owner retrieved his pickup from the impound lot, he noticed "the clutch ... was acting funny on it," and when he got back home he went to work adjusting it. That is when he discovered the shotgun.)

12. This would also require our rejection of appellants' grounds of error one through four which assail the admissibility, of their confessions under the Fifth Amendment.

13. We are not told, for instance, whether appellants were taken before a magistrate, as Article 15.17, V.A.C.C.P., dictates. In a sworn pleading filed pretrial each appellant states he was not.

would turn up;" with an N.C.I.C. report that appellants were "known offenders" at hand, their disabled vehicle was apparently searched. See *id.*

■ This Court is not prepared to say that the record before us affirmatively establishes appellants' confessions were obtained by exploitation of their unlawful arrests. Indeed, it clearly does not. But as we understand the pronouncements of the Supreme Court, explicated fully by us in *Green,* supra, it is no longer open to debate that the affirmative burden is on the *State* to address the relevant factors by presentation of evidence which forms a basis for concluding a voluntary statement was *not* the product of an illegal arrest and detention. See also *Taylor v. Alabama,* supra.

■ We recognize the difficulty of meeting such a heavy burden. But as the Supreme Court has observed, to admit a voluntary confession taken subsequent to an arrest which is shown to have been unauthorized and hence unreasonable, would allow "law enforcement officers to violate the Fourth Amendment with impunity, safe in the knowledge that they could wash their hands in the 'procedural safeguards' of the Fifth"—unless the State can establish that intervening events broke the connection between the illegal arrest and the confession. *Dunaway v. New York,* supra, at 2260 of 99 S.Ct. At the risk of redundancy, we stress our holding does not encompass a determination that no intervening circumstances of significance broke the connection in the instant case; but, we do hold the State has failed to address and, therefore meet, the burden of proof which is justly placed upon it by appellants' motions to suppress.

These convictions are reversed and the causes are remanded to the trial court.

Before the Court en banc.

## DISSENTING OPINION TO OVERRULING STATE'S MOTION FOR REHEARING WITHOUT WRITTEN OPINION

McCORMICK, Judge.

On original submission of these causes, a panel of this Court held that although the record did not affirmatively establish that appellants' confessions were obtained by exploitation of their unlawful arrests, the State did not fulfill its burden in producing evidence which supported the conclusion that the appellants' statements were *not* the product of an illegal arrest and detention. Thus the convictions were reversed.

Officer R.D. Bowers of the Mesquite police department testified that on October 25, 1978, he and his partner, Officer Peters, received a radio call that there were some suspicious people on Holley Street. Bowers and Peters arrived at the designated location and saw a pickup truck parked along the side of Holley Street. The appellants were standing by the tailgate of the pickup. Officer Bowers parked his car "[d]irectly in front of their vehicle." The record also indicates that another Mesquite police officer, Perkins, responded to the call but there is no indication in the record as to where he parked his car, if indeed he did park his car. In fact, the record does not mention him beyond stating that he responded to the call; thus it is conceivable to believe that he did not stay at the scene. Bowers and Peters got out of the car, asked the appellants for identification and asked them what they were doing in the area since it was primarily a residential and business area and the businesses were not open at that time. The appellants replied that they were electricians and on their way to work and the clutch on the pickup had gone out. They furthermore volunteered that someone was on the way to help them.

As the officers were talking with the appellants, the appellants walked to the side of the truck and at one point got in the truck and sat for some ten to fifteen minutes. While the appellants were sitting inside the truck, the officers, as a routine matter, radioed in a check on the appellants' identification and the motor vehicle registration on the pickup. Bowers related that he and Peters were "talking to them about their purpose in being there and see-

ing if we could give them any help, and where they worked at and things and just generally carrying on a conversation while they were sitting inside the pickup truck" when they received a report that the appellants were known offenders. The officers continued talking to appellants as they waited for the result of the motor vehicle check. As they waited, the record shows that the appellants exited the pickup and walked to the front of the truck. On direct examination, Bowers testified that the following events then occurred:

> "As I said when we was running this computer check, one of them wanted to get back in the pickup, and we had this N.C.I.C. hit that we ran on them on known offenders, and so for officer's safety, I walked around there and opened the door for him to get the cigarettes, and in plain view, there was a gun case laying in the floorboard on the passenger's side of the pickup."

The officer opened the gun case and found a .22 automatic. The officer then placed appellants under arrest for carrying a gun. After the appellants had been placed under arrest, the officers received a message that the pickup truck had been stolen from a parking lot in Cleburne.

The pickup truck was impounded and returned to its owners, Jan and Ernest Cotton. The Cottons testified that after they got their truck back, they found a shotgun and a sack full of credit cards and drivers' licenses in the truck.

Sometime between the day of their arrest and October 28, appellants were transferred from the Mesquite City Jail to the Dallas County Jail. On October 28, David Ward, the investigator for the Erath County district attorney's office went to Dallas with Detective Antonio Vidaurri of the Cleburne police department to talk with the appellants regarding the property found by the Cottons in their truck and its connection to the instant offense. Both appellants were advised of their rights and, during their interviews with Ward and Vidaurri, both appellants confessed to the instant offense.

On rehearing, the State argues that the panel opinion while concentrating on the State's burden of proof in showing that the warrantless arrest was legal and in negating the taint therefrom fails to recognize that the appellants failed in satisfying their initial burden of proof, to wit: proving that there was in fact an arrest or detention prior to the finding of the gun and prior to the valid arrest following thereafter. Thus, the failure of the appellants to meet this threshold burden, that is, proving that there was in fact an arrest or detention prior to the discovery of the gun, closed the door on any further inquiry. The State cites us to several cases in support of its proposition including *Alexander v. State,* 131 Tex.Cr.R. 366, 99 S.W.2d 305 (1936). In *Alexander,* supra, the defendant asserted that the police made a search of his premises without a search warrant and thus the evidence obtained as a result of that search was inadmissible. This Court held that because Alexander failed to show that the officers did not have a search warrant the presumption prevailed that the officers acted in accordance with the law of the land.

My own research reveals that in *Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 415, 9 L.Ed.2d 441 (1963), Justice Brennan, in analyzing the doctrine of "the fruit of the poisonous tree", wrote that the crucial issue is:

> "'whether, *granting establishment of the primary illegality,* the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959)." (emphasis added) *Wong Sun v. U.S.,* supra, 371 U.S. at 488, 83 S.Ct. at 417.

Thus, it is axiomatic that before the inquiry into the "fruit" commences, it must first be established that there is a "poisonous tree". *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Green v. State,* 615 S.W.2d 700 (Tex.Cr. App.1980).

The panel opinion addressed this issue as follows:

"While it might be inferred from the scant record before us that the initial arrival of two patrol cars containing three apparently uniformed police officers, one parking 'eye to eye' with appellants' truck and the other positioned behind, constituted a 'seizure' of appellants at that moment, we are reluctant to resolve the issue on this circumstance alone. For, though little is clear from this record, it does establish that at a later point appellants were in fact 'detained' by the officers to the extent that they had to 'ask' for cigarettes from the truck, and Officer Bowers, for his 'own safety,' felt an appropriate response to this request was that *he* should go to the passenger's side, open the door and [(sic)] into the vehicle for them."

What constitutes a "seizure" under the Fourth Amendment? In *U.S. v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), Justice Stewart wrote:

"We adhere to the view that a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards. The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.' *United States v. Martinez-Fuerte*, 428 U.S. 543, 554, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116. As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.

"Moreover, characterizing every street encounter between a citizen and the police as a 'seizure,' while not enhancing any interest secured by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices. The Court has on other occasions referred to the acknowledged need for police questioning as a tool in the effective enforcement of the criminal laws. 'Without such investigation, those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished. *Haynes v. Washington*, 373 U.S. 503, 515, [83 S.Ct. 1336, 1344, 10 L.Ed.2d 513].' *Schneckloth v. Bustamonte*, 412 U.S. [218], at 225, 93 S.Ct. [2041], at 2046 [36 L.Ed.2d 854 (1973)].

"We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. See *Terry v. Ohio*, supra, 392 U.S. [1], at 19, n. 16, 88 S.Ct. [1868], at 1879, n. 16 [20 L.Ed.2d 889 (1968)]. *Dunaway v. New York*, 442 U.S. 200, 207, and n. 6, 99 S.Ct. 2248, 2253, 60 L.Ed.2d 824; 3 W. LaFave, Search and Seizure 53–55 (1978). In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." (footnotes omitted) *U.S. v. Mendenhall*, 446 U.S. [544] at 554, 100 S.Ct. [1870] at 1877 [64 L.Ed.2d 497 (1980)].

Using the above analysis, the record does not support the panel opinion's interpretation of the facts. Although three officers responded to the call, there is no evidence that the third officer parked his car at the scene or even remained at the scene. Furthermore the record does not show that one

of the police cars was parked "eye to eye" with the pickup truck. Thus the panel erred in inferring that the pickup truck was blocked in. Secondly, although one of the officers accompanied one of the appellants to the truck when he went to get cigarettes, this fact alone is not sufficient to show a "seizure".

When reading the record, I find that there is no evidence which shows that the appellants' movements were in any way restricted. The appellants testified outside the presence of the jury but neither one testified that he felt restricted in his movement. Officer Bowers' testimony indicates that he and Peters were merely visiting with appellants while they were waiting for their routine checks to be completed. At no time did he testify that the appellants were detained prior to their arrest for unlawfully carrying a weapon. The panel relies on *Ebarb v. State*, 598 S.W.2d 842 (Tex.Cr.App.1980), as authority for their holding. However, *Ebarb* can be distinguished from the instant case in that in *Ebarb* the sheriff testified that he would not have allowed Mrs. Ebarb or the other occupants of the car to leave once they had been approached. *Ebarb v. State*, supra, at p. 844, n. 1. There was no such testimony in the instant case.

"... Obviously, not all personal intercourse between policemen and citizens involve 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, at 20, n. 16, 88 S.Ct. 1868, at 1879, n. 16, 20 L.Ed.2d 889 (1968).

Based on the record before us, the appellants were not detained prior to the discovery of the pistol in the truck.

We should next determine if the warrantless arrest of appellants which occurred after the discovery of the pistol was proper. Appellants argue that the warrantless arrest was improper in that it was based on evidence found as a result of an illegal search. However, appellants have no standing to contest this search in that the pickup was stolen and they asserted no possessory interest in it. *Viduarri v. State*, 626 S.W.2d 749 (Tex.Cr.App.1981); *Hutchinson v. State*, 509 S.W.2d 598, 599 (Tex.Cr.App.1974). The record shows that appellants were arrested after the officers found the gun in the truck. Clearly the discovery of the gun gave the officers probable cause to arrest appellants.

Because there was no detention prior to the discovery of the gun and because the officers, after finding the gun, had probable cause to make a warrantless arrest of appellants, I would hold that there was no poisonous tree and that the confessions of appellants were not tainted and thus were properly admitted.

To the majority's failure to do so, I dissent.

TOM G. DAVIS, W.C. DAVIS and CAMPBELL, JJ., join in this dissent.