Larry Lee TOWNSLEY, Appellant,

v.

The STATE of Texas, Appellee.

No. 583–82.

Court of Criminal Appeals of Texas, En Banc.

June 22, 1983.

792

Steve Brittain, John K. Dietz, Austin, for appellant.

Ronald Earle, Dist. Atty. and James M. Connolley, Asst. Dist. Atty., Robert Huttash, State's Atty. and Alfred Walker, Asst. State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

TOM G. DAVIS, Judge.

After finding appellant guilty of murder, the jury assessed punishment at ninety-nine years. The conviction was affirmed by the Court of Appeals for the Third Supreme Judicial District (Austin). We granted appellant's petition for discretionary review in order to examine the Court of Appeals' holding that appellant's three written confessions were not tainted by appellant's illegal arrest.

Appellant was convicted of murdering Pauline Blair, his girlfriend, late in the evening of November 9, 1980, by intending to permanently disfigure her and, "committing an act clearly dangerous to human life, to-wit: causing Pauline Blair to inhale and

ingest ether, thereby causing the death of Pauline Blair."

The deceased's body was discovered at her trailer home by co-workers at approximately 9:00 a.m., on Monday, November 10. The police arrived shortly thereafter. Sergeant Gary Richards of the Austin Police Department was in charge of the investigation.

Portions of the deceased's hair had been cut off and left on her pillow. Acid had been poured on the deceased's face, disfiguring it, and her pubic hair had been set on fire.

The police learned from the trailer park manager that appellant lived with the deceased. The manager had last seen him on the previous Friday when appellant paid the deceased's utility bill.

About this time, appellant pulled up in his vehicle. He was with his mother and brother who had accompanied him to Austin from Brownwood. Appellant was questioned for ten minutes and was asked to come down to the police station with his relatives. Appellant agreed to this request. The trial court found that appellant voluntarily went to the police station.

At approximately 11:00 a.m., appellant and the officers arrived at police headquarters. Appellant was questioned in one interview room and his mother in another. Appellant was in a five-by-seven foot room with no windows and the door locked. He was given *Miranda* warnings and questioned from 11:00 a.m. to 2:00 p.m. by Sergeant Gary Fleming.

Appellant's mother left the station at about 2:00 p.m. She asked to speak with appellant in order to borrow gas money. Appellant was allowed to speak with his mother for a few minutes in the hall outside the interview room in the presence of officers. Appellant then returned to the interview room where he was questioned by Sergeant Richards until 4:00 p.m. Sergeant Richards gave appellant the *Miranda* warnings.

As soon as appellant arrived at the station the police ran a warrant check to see if there was anything they could hold him for so that he could be questioned. The undisputed testimony of Sergeant Fleming was that some outstanding traffic commitments were discovered and that appellant was not free to leave as of 11:30 a.m.

At approximately 4:00 p.m., appellant demanded to be charged or released. (At 3:30 p.m. Sergeant Richards had given him another *Miranda* warning.) Sergeant Richards took appellant to the booking desk to be booked into jail for the traffic commitments. Sergeant Richards placed a hold on appellant for investigation of homicide.

Appellant's traffic fines totaled $56.00 and appellant, who had over $100.00, offered to pay the fines in order to secure his release. Sergeant Richards told appellant that he could not be released due to the hold for investigation of homicide. Appellant was not taken before a magistrate.

After appellant was booked into jail at 4:00 p.m. on the 10th, he was placed in a cell. He was not interrogated again until 9:00 p.m. Sergeant Lloyd Polk interrogated appellant from 9:00 p.m. to 10:30 p.m. Sergeant Richards took over the questioning between 10:30 p.m. and 12:30 a.m.

On the morning of November 11, Sergeant Richards and Sergeant Polk took appellant from his cell at 9:35. Appellant was taken before Austin Municipal Court Judge David Phillips for a magistrate's warning at 10:37 a.m. Appellant was told he was being held for suspicion and investigation of murder.

After the warning, appellant was taken back to the homicide detail. Appellant stayed in the homicide detail until 3:30 p.m. when Sergeants Richards and Polk escorted him to Central Texas Polygraph. There is conflicting testimony about what transpired during appellant's stay at the homicide detail. The trier of fact appears to have resolved the conflict in favor of the State. Accepting the State's version of events, appellant asked not to be put back in his cell. He was allowed to remain with the officers in the homicide detail. Within that area he was free to do as he pleased. He talked

with officers, but not about the homicide. He was shown an electric blanket cord thought to have been used to bind the deceased.

At Central Texas Polygraph appellant was examined by former Austin Police Operator Doug Ferris until approximately 5:45 p.m. Sergeant Richards chose Ferris because he was the most competent examiner available. Appellant was left alone with Ferris.

All are agreed that when appellant left the examination room he was crying and visibly upset. At this time, on the parking lot at Central Texas Polygraph appellant orally admitted his involvement in the deceased's death.

Sergeant Richards told appellant that in most instances an oral confession cannot be used against a defendant in Texas courts. Sergeant Richards took appellant back to the homicide division and then to dinner at a Mexican restaurant. At 7:30 p.m. Sergeant Richards and appellant went back to the homicide detail. Appellant requested to speak to a district attorney.

Travis County Assistant District Attorney Larry Black arrived at the police station around 9:00 p.m. Black also informed appellant that in most instances an oral confession cannot be used against a defendant. Appellant posed several questions to Black concerning which of various homicide statutes he might be prosecuted under and what kind of treatment he was likely to receive.

The taking of the first written statement began at 9:20 p.m. on the 11th of November and was completed at 12:30 a.m.

Following the filing of a formal complaint, Sergeant Richards, appellant, Black and three officers went to Highway 183 to search for evidence appellant had disposed of. Appellant and the others returned to the police station sometime between 3:30 and 4:00 a.m.

Between 1:00 and 2:00 p.m. on November 12, appellant gave a second written statement.

After the taking of the second written statement, and up until the afternoon of November 14, appellant, though in custody and in the presence of officers at all times, was allowed greater freedom of movement. He was allowed to go to the deceased's trailer for a change of clothes. Several times he was allowed to visit the deceased at a funeral parlor. He was sometimes given permission to stay out of his cell and remain in the homicide division. On one such occasion appellant signed a consent to search for blood and hair samples which were later taken at a hospital.

Appellant also accompanied Sergeant Richards and other officers to Brownwood to visit the store where appellant purchased the ether allegedly used to kill the deceased. Statements were taken from appellant's family members. Appellant was allowed to visit his family at the Brownwood Police Station.

On the afternoon of the 14th, appellant was taken before a magistrate and warned of the formal charges filed against him on the morning of the 12th.

Later, appellant was questioned further by Sergeant Richards and was allowed to see his wife at 3:00 p.m.

Sergeant Richards did not see appellant again until 9:00 a.m. on November 17. Sergeant Richards wanted a third written statement from appellant, so that he could have all of the information together in one statement. The third statement was taken at this time, with appellant changing his story when Sergeant Richards indicated that something was false. After the taking of the third statement appellant requested an attorney.[1]

The Court of Appeals' opinion assumes that appellant was not illegally arrested until he unsuccessfully attempted to pay his traffic fines at 4:00 p.m. on November 10. We agree with this proposition. Though

---

**1.** Though all the written confessions were damaging to the appellant, the second and third confessions were more incriminating than the first.

the officers looked for outstanding warrants *in order* to hold appellant for further questioning regarding his girlfriend's murder, appellant's detention between 11:30 a.m. and 4:00 p.m. was based at least in part on two outstanding traffic commitments. See *Dodson v. State*, 646 S.W.2d 177.

The Court of Appeals also assumes that no probable cause existed to arrest appellant for the murder of his girlfriend until he orally confessed on the night of the 11th. We disagree with this assessment.

 In order to determine when or if probable cause existed on the 10th, a detailed review of the information in police hands is required.

The police were in possession of the following facts by 4:00 p.m. on the 10th:

(1) There was a sticky matted substance on appellant's boots. Embedded in the substance was cut human hair which, according to Sergeant Fleming, appeared to match the cut hair found on the deceased's pillow.

(2) Appellant stated that he was in the mobile home with the deceased late in the evening on the 9th. He thus placed himself at the scene of the crime, in the presence of the victim, close to when the crime occurred.

(3) There was some discoloration on the tip of one of appellant's boots. Sergeant Fleming thought the discoloration "could possibly have been made by whatever caustic material" was poured over the deceased's body.

(4) Appellant's story of his activities aroused suspicion. According to the appellant, he had last seen the deceased on Sunday the 9th. (The deceased had been in Houston from the 7th through the 9th.) He came over to the deceased's house to tell her that her dog had died the previous night. The deceased became very upset and asked appellant to leave. A few hours later appellant drove to Brownwood and woke up his mother and brother. He asked them to go with him to Austin so that they could meet the woman he loved and wanted to marry. Aside from the inherent implausibility of this story, we note that appellant and his family arrived at the mobile home at 10:30 a.m. on a weekday when the deceased should have been away at her job.

(5) There was no forced entry, burglary, or ransacking of the deceased's mobile home. Very personal things were done to the victim including facial disfigurement, hair cutting, and burning of the vaginal area. This indicated that the killer was probably someone who knew the victim well. The police knew that appellant lived with the deceased on weekends.

(6) There were discrepancies between the stories told by appellant and his mother on Monday the 10th. Appellant stated that he came home to Brownwood at approximately 3:00 a.m. while his mother had him arriving around midnight. Appellant's mother told officers that either she or appellant would have to go back to Brownwood and pick up appellant's children at school. Appellant said that his children were home sick.

Though the above facts were sufficient to raise suspicions that the appellant killed the deceased, they did not constitute probable cause. None of the officers associated with the case believed that they had probable cause to arrest appellant at 4:00 p.m. on the 10th. Nevertheless, appellant was "held for investigation of homicide." This was clearly improper and amounted to an illegal arrest.

In *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), the United States Supreme Court made it clear that the police cannot hold anyone for investigation (beyond the very brief kind of stop and frisk allowed in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968),) of a homicide on less than probable cause. There being no probable cause to arrest appellant for the murder of his girlfriend,

there was no probable cause to hold him for investigation or suspicion of the homicide.

Between 4:00 p.m. and 10:30 p.m. on the 10th, Sergeant Richards obtained two new pieces of crucial information. First, some red pubic hairs were discovered in the deceased's mouth and between her buttocks. Appellant had red hair.

Also, the deceased's next-door-neighbor reported that on the evening of the murder, appellant borrowed a chair and a pair of binoculars from him in order to sit outside and look into the deceased's mobile home.

When added to the information already in police hands, this new evidence established probable cause. The record is silent as to when or if the officers believed they had probable cause to arrest appellant for murder prior to his oral confession. Nothing in the record suggests that at 10:30 p.m. the officers suddenly realized that probable cause existed. The mere subjective conclusion of a police officer concerning the existence of probable cause is not binding on this Court which must independently scrutinize the objective facts to determine the existence of probable cause. *United States v. Gray,* 659 F.2d 1296 (5th Cir.1981); *United States v. Clark,* 559 F.2d 420 (5th Cir.1977); *United States ex rel. Senk v. Brierley,* 381 F.Supp. 447 (M.D.Pa.1974); 1 W. LaFave, Search and Seizure: A treatise on the Fourth Amendment, Sec. 3.2(b) (1978).

On a normal weekend the presence of red pubic hairs on the deceased might not have been an extraordinary event since the deceased and appellant cohabited. But the deceased had been in Houston on this particular weekend. The police knew that appellant had not spent the night with the deceased since Wednesday the 5th. Further, it appeared from appellant's story of his brief encounter with the deceased on Sunday night that he did not engage in any intercourse with her at that time.

As for the binoculars and the chair, appellant's behavior would be extremely odd under any circumstances. The record establishes that appellant's vision was severely limited. The binoculars would have aided him in determining whether the deceased had retired for the night.

To summarize, the police had the following information in their hands by 10:30 p.m. on the 10th:

(1) Cut hair on appellant's boots, apparently matching the cut hair on the deceased's pillow.

(2) Appellant's admission that he was at the scene of the crime with the deceased on Sunday night.

(3) Discoloration on appellant's boots, possibly matching the substance poured on the deceased's face.

(4) Appellant's unlikely story of his activities on the night of the murder.

(5) The highly personalized nature of the crime against the deceased coupled with appellant's intimate relationship with her.

(6) Discrepancies between the statements of appellant and his mother.

(7) The discovery of red pubic hair on the deceased's body which matched appellant's hair color.

(8) The discovery that on the night of the offense the appellant borrowed a chair and a pair of binoculars from the deceased's next-door-neighbor so that he could look into the deceased's mobile home.

The above facts and circumstances were sufficient in and of themselves to warrant men of reasonable caution in the belief that an offense had been committed and that appellant had committed the offense. *Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

The existence of probable cause at 10:30 p.m. does not alter the illegality of appellant's arrest at 4:00 p.m. It does, however, have great bearing on whether appellant's confessions were the fruit of his illegal detention at 4:00 p.m.

A confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that

the confession is sufficiently an act of free will to purge the primary taint. *Taylor v. Alabama,* —— U.S. ——, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Duncan v. State,* 639 S.W.2d 314; *Green v. State,* 615 S.W.2d 700.

■ The Supreme Court usually looks at four factors to help determine if the confession was an act of free will. First, whether *Miranda* warnings were given. While the warnings are not alone enough to purge the taint of an illegal arrest, they are not insignificant and are a threshold requirement. Here, the evidence is clear that *Miranda* warnings were repeatedly given to the appellant.

Proximity of the confession to the arrest is also of importance. The longer the time elapsed between confession and arrest the more likely it is that the taint of the illegal arrest will be attenuated. In the instant case, appellant confessed over 24 hours after the illegal detention between 4:00 and 10:30 p.m.

The Supreme Court has also noted that the purpose and flagrancy of the primary illegality is relevant in determining attenuation of the taint. The action of the Austin police officers in holding the appellant for investigation of homicide when they knew they had no probable cause to arrest him was an improper and flagrant violation of his Fourth Amendment rights.

The most important factor to be considered, particularly in the context of this case, is the presence of intervening circumstances.

■ Appellant was not illegally detained until 4:00 p.m. on the 10th.[2] At 10:30 p.m. the police had probable cause to detain him for the murder of his girlfriend. After 10:30 p.m. on the 10th appellant was legally confined. Thus any questioning following

this time was not tainted by a Fourth Amendment violation. Such questioning and confinement were intervening circumstances between the illegal detention and the confession.

In this regard it is necessary to mention a crucial difference between this case and *Taylor v. Alabama,* supra. In *Taylor,* an arrest warrant was filed against the illegally detained defendant after his fingerprints were matched with fingerprints at the crime scene. The State contended that the arrest warrant constituted an intervening factor between the defendant's illegal arrest and confession. The Supreme Court rejected this argument, noting that the fingerprints taken at the police station were themselves the fruit of an illegal detention.

■ By way of contrast, none of the information used to establish probable cause in the instant case was the fruit of an illegal arrest.

The red pubic hairs were discovered through an examination of the deceased's body. The story about the chair and binoculars came from a routine interview with the deceased's neighbor. All other information in police hands was obtained before 4:00 p.m. when appellant's detention became illegal.

As discussed earlier, appellant was put into a cell at 4:00 p.m. and was not interviewed at all until 9:00 p.m. So far as the record indicates, nothing of significance was gleaned from Sergeant Polk's interrogation of appellant which ended at 10:30 p.m. Appellant did not confess until approximately 23 hours later.

■ Under these circumstances it would be unrealistic *not* to conclude that significant intervening events broke any causal connection between appellant's brief illegal detention (during which time he was inter-

**2.** Unlike the situation in *Gant v. State,* 649 S.W.2d 30, there was never a demand by appellant's counsel to see the traffic commitments. Appellant's theory was not that the traffic commitments were invalid or non-existent, but that he had been improperly arrested without a warrant from the moment he was transported

to the police station. There was never any suggestion throughout the lengthy pre-trial proceeding that any impropriety surrounded the existence of the traffic commitments. Though the record does not reflect that the commitments were exhibited to the trial court, appellant effectively waived the issue.

viewed only once) and his subsequent confessions.

Had probable cause not been established at 10:30 p.m., we would not necessarily reach the same result. Then we would have been forced to look at the full range of police activity occurring between appellant's illegal detention and first written confession on the evening of the 11th.

The judgment of the Court of Appeals is affirmed.

CLINTON and TEAGUE, JJ., dissent.