Jeffery FINNEY, Appellant,

v.

The STATE of Texas, Appellee.

No. 3–83–108–CR.

Court of Appeals of Texas, Austin.

May 9, 1984.

Penny Puryear Burt, Austin (court-appointed), for appellant.

Edward J. Walsh, Dist. Atty., Ken Anderson, Asst. Dist. Atty., Georgetown, for appellee.

Before PHILLIPS, C.J., and EARL W. SMITH and GAMMAGE, JJ.

EARL W. SMITH, Justice.

Jeffery Finney was found guilty by a jury of the offense of burglary of a habitation of Harold Stewart in Williamson Coun-

ty. The jury also found that Finney was the same person who previously had been convicted of burglary of a building, as alleged in the enhancement paragraph of the indictment, and assessed his punishment at fifteen years and six months. We affirm the judgment of the trial court, duly pronounced pursuant to the verdict.

On appeal, in his first two grounds of error, Finney contends that the trial court erred in refusing to grant his motion to suppress evidence for the reasons that the evidence was tainted by an illegal arrest and was the fruit of a warrantless search. In the next three grounds of error, he argues that the trial court erred in refusing to suppress his confession because it was involuntary in that it was obtained in violation of his Sixth Amendment right to counsel, it was given as a result of physical and psychological duress and coercion, and was the fruit of an illegal arrest and search. A hearing was held on Finney's motions to suppress the evidence and confession. Because the grounds asserted are interrelated, we discuss the evidence adduced at the hearing.

### THE ARREST AND SEARCH

Some two or three weeks before March 17, 1981, a burglary occurred in Lee County. On March 17, at about 11:00 A.M., Officer Claxton, a Department of Public Safety trooper, was in the Lee County Sheriff's office, when the dispatcher received a telephone call from either Bonnie Menzel or her son, who Claxton said was a relative of the owners of the burglarized premises. According to Claxton, the caller reported that a vehicle matching the description of, and bearing the license number of a vehicle that was "though to be involved in a burglary in Lee County" that occurred two or three weeks earlier, was at a roadside park on U.S. Highway 290 approximately three miles west of Giddings. Claxton had no other details of the burglary. He had no knowledge as to whether the person who called the dispatcher was the same person that purportedly had seen the vehicle near the burglary. He had no

recollection of whether the vehicle was supposed to be a long or short-based pickup. He checked the license number through the sheriff's office, but had no recollection as to who might be the registered owner. He did not make an offense report, nor did he participate in the investigation of the burglary.

Deputy Sheriff Meyer of Lee County was in the sheriff's office when the dispatcher received the phone call. According to him, the call came from the sister of the woman whose residence was burglarized. He said that the caller was not a witness to the burglary—it was another person (a neighbor of the owner of the residence) who had seen the vehicle driving out of the driveway of the burglarized premises, followed the vehicle, and obtained the license number.

On receipt of this information from the dispatcher, Claxton and Meyer left the sheriff's office to locate the vehicle. There is no evidence that the officers had any information as to how many occupants there were in the vehicle seen near the burglary, nor any description of a person or persons occupying the vehicle. There was no evidence that Finney or any other described person was seen to enter the residence, or remove any property therefrom. There was no evidence that Finney was an occupant of the described vehicle, nor that he was in any way involved in the burglary. Claxton testified that he was not aware of any of the facts of the burglary other than that some weapons were taken. On this basis, he thought the occupants of the vehicle might have been armed.

Claxton and Meyer traveled west on Highway 290 in Claxton's marked Department of Public Safety patrol car. They encountered a 1962 black Chevrolet pickup with a camper on the back which bore the reported license number. The vehicle was traveling east towards Giddings. Claxton turned his vehicle around, followed the pickup and turned his red lights on to stop it. The pickup stopped promptly and without any problem. Claxton stopped his pa-

trol car some thirty feet behind the pickup, got out, and using his public address system, told the driver (later identified as Finney) that he wanted him to exit the pickup and "come to me." The driver promptly did so. Claxton said that

> "once the driver of the vehicle came to the front of my vehicle, I believe *I handcuffed him at that time.* I may have talked to him for a few minutes before I did that. And we proceeded to get the passenger out of the vehicle *in the same manner.*"

Claxton further testified that he did not recall *any* particular conversation with the driver before he was handcuffed, agreed that he handcuffed him *before* any conversation, and that he did not recall any conversation *after* the driver was so handcuffed. He said that when he told the driver to come to him that he, Claxton, might have had his rifle in his hand.

When the passenger (later identified as Mickey Emerson) exited the vehicle, it was determined that he was holding a small child, which he continued to do until both men were taken to the sheriff's office. Therefore, Emerson was not handcuffed. Both men were frisked. No weapons or contraband were found on either. Neither Finney nor Emerson was asked who owned the pickup nor any questions concerning where the pickup may have been on the date of the alleged burglary. Finney was asked to produce his driver's license. Both Finney and Emerson readily and correctly identified themselves.

Prior to the stop of the pickup, it was not seen to have violated any traffic laws nor to have been driven in other than an ordinary manner. There was no outstanding warrant for the arrest of Finney or Emerson. It is clear, nevertheless, that both men were placed under custodial arrest. Claxton, in fact, told Finney that he was under arrest for suspicion of theft or burglary. With both men in custody at the patrol car, the officers proceeded to search the pickup. There is no evidence that weapons or contraband were found in the passenger compartment of the pickup. As to the search of the camper, Claxton testified that they could not completely see the inside of the camper. He said:

> We could see partially through the back door. We wanted to make sure that there were no other occupants of the vehicle. Like I said, prior to that time there were some weapons believed to be—that were stolen and in a prior burglary. We wanted to make sure for our safety that there were no other occupants inside the back of the camper.

Claxton waited for Meyer to make the search and said that it was not a "full blown search." He described it as "just an open-the-door search to, you know, make sure there were no people inside." He said: "Apparently there was a—I don't know whether it was a rug or towel or *what* covering the items on the floor [of the camper] and he [Meyer] naturally lifted [the covering] up to see if there was someone under there, or what." He said that Meyer discovered several items such as television sets, movie equipment, a camera and "things like that." No weapons, contraband or other person was found in the camper. It is important to note that none of the items in the camper were shown to be connected in any way with the earlier *Lee County* burglary. Neither Finney nor Emerson were asked their whereabouts on the date of the Lee County burglary, nor to whom the items in the camper belonged. Claxton said, as an explanation for opening the door to the camper, that he had "a concern for seeing if there was anything back there that could have been stolen property."

Meyer's testimony was similar to that of Claxton as to the stop of the pickup and ensuing events, except that he said "it was possible" that he did not learn the identity of the two men until they were taken to the sheriff's office. He admitted that the officers had no search warrant for the pickup or the camper. At no time in his search of the pickup and camper did he see any weapons or any other persons. Meyer said that after both men were removed from the pickup, he looked in the camper through

the back-door window, and that it appeared that there was "a bunch of stuff" covered with a "tarp, or blanket, or something like that." When he opened the door and lifted the covering, he saw two television sets, some stereo speakers, and stereo equipment. He said the property did not "fit with the type of truck and also the two suspects." Just how it would be out of the ordinary for a person to own or have in his possession two television sets, stereo equipment, and speakers was not explained.

No *Miranda* warnings were given to either man. They were then taken to the sheriff's office in Giddings, where, for the *first* time the men were asked about the "stuff." Meyer said that the man told him that they were taking it to Houston to Sterling Emerson [later shown to be Mickey Emerson's brother]. Upon arrival at the sheriff's office, the camper was again searched. Meyer said: "When we got to the sheriff's office, we looked through it [contents of the camper] thinking maybe some of our items that had been taken in our [Lee County] burglary would be in there." No such items were claimed by the State to have been found. No complaints of any type were filed against either man in *Lee County*.

However, a camera bearing the name "Stewart Photo" was discovered. By searching telephone directories, it was determined that Stewart Photo, owned by Harold Stewart, was located in Leander, *Williamson County*. Stewart was contacted by telephone on the same date of Finney's arrest, and Stewart verified that he had been the victim of a burglary the day before. The Williamson County Sheriff's Office was contacted, and warrants for the arrest of Finney and Emerson were issued in Williamson County. Some two hours later, Williamson County officers transported Finney and Emerson to Williamson County where Finney was incarcerated until trial.

In their briefs, both Finney and the State agree that the officers had adequate reason to stop the pickup and to briefly detain the occupants for the purpose of conducting further investigation under the authority of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). A pat-down search of the two men for weapons, in the absence of probable cause to arrest, was authorized under *Terry, supra. Terry* did not address the question whether such a protective search for weapons could extend to an area beyond the person, in the absence of cause for arrest.

In *Michigan v. Long*, —— U.S. ——, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) the area search under *Terry* concepts was extended to the *passenger* compartment of a vehicle. In *Long* the defendant, stopped under authority of *Terry*, was about to reenter the passenger compartment of his automobile to obtain his vehicle registration, as requested by the officers. The officers followed him and observed a large hunting knife on the floorboard of the driver's side of the automobile. The officer shined a flashlight into the interior of the vehicle to search for other weapons. Noting that something was protruding from under the armrest on the front seat, the officer knelt in the vehicle, lifted the armrest, saw an open pouch on the front seat, flashed his light in the pouch, and determined that it contained what appeared to be marijuana, for possession of which Long was then arrested. The vehicle was impounded and the officer opened the trunk, which did not have a lock, and discovered therein approximately 75 pounds of marijuana.

The trial court denied Long's motion to suppress the marijuana taken both from the interior of the car and its trunk. Long was convicted of possession of marijuana and the Michigan Court of Appeals affirmed the conviction, holding that the search of the passenger compartment was valid as a protective search under *Terry, supra*, and that the search of the *trunk* was valid as an inventory search under *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). The Michigan Supreme Court reversed, holding that "the sole justification of the Terry search, protection of the police officers and others nearby, cannot justify the search in

this case." — U.S. ——, 103 S.Ct. 3474, 77 L.Ed.2d 1211. The marijuana found in the trunk of the automobile was considered by the Michigan Supreme Court to be the " 'fruit' of the illegal search of the interior." — U.S. ——, 103 S.Ct. 3474, 77 L.Ed.2d 1212. Certiorari was granted by the United States Supreme Court *"to consider the important question of the authority of a police officer to protect himself by conducting a Terry-type search of the passenger compartment of a motor vehicle during the lawful investigatory stop of the occupants of the vehicle." Id.* (emphasis added).

In its opinion in *Michigan v. Long, supra,* the United States Supreme Court reversed the Michigan Supreme Court, holding that the search of the passenger compartment was valid. However the Court held that its determination that the initial search [of the passenger compartment] was valid made it necessary to determine whether the trunk search was permissible under the Fourth Amendment. The Supreme Court declined to address the latter point because it was not passed upon by the Michigan Supreme Court.

■ The decision of the United States Supreme Court in *Long, supra,* is clearly limited to investigatory stops and limited area searches, to wit: the passenger compartment of the vehicle. At — U.S. ——, 103 S.Ct. 3480, 77 L.Ed.2d 1220, footnote 14, the Court said:

We stress that our decision does not mean that the police may conduct automobile searches *whenever* they conduct an investigative stop, although the "bright line" that we drew in Belton clearly authorizes such a search whenever officers effect a custodial arrest. An additional interest exists in the arrest context, i.e., preservation of evidence, and this justifies an "automatic" search. However, that additional interest does not exist in the *Terry* context. A *Terry* search, "unlike a search without a warrant incident to a lawful arrest, is not justified by any need to prevent the disappearance or destruction of evidence of

crime.... The sole justification of the search ... is the protection of police officers and others nearby...." (citation omitted). What we borrow now from *Chimel v. California,* 395 U.S. 752 [89 S.Ct. 2034, 23 L.Ed.2d 685] ... (1969) and Belton is merely the recognition that part of the reason to allow area searches incident to an arrest is that the arrestee, who may not himself be armed, may be able to gain access to weapons to injure officers or others nearby, or otherwise to hinder legitimate police activity. This recognition applies as well in the *Terry* context. However, because the interest in collecting and preserving evidence is not present in the *Terry* context, we require that officers who conduct area searches during investigative detentions must do so only when they have the level of suspicion identified in *Terry.* (emphasis in original).

At — U.S. ——, 103 S.Ct. 3482, 77 L.Ed.2d 1222, footnote 16, the Court additionally stated that "[w]e have recognized that *Terry* searches are limited insofar as they may not be conducted in the absence of an articulable suspicion that the intrusion is justified and that they are protective in nature and limited to weapons." (citations omitted).

The decision in *Long* is clear that the search of the trunk depended upon the search of the passenger compartment, followed by arrest for possession of marijuana found therein. Nowhere does the United States Supreme Court hold that the search of the trunk of the automobile was authorized under an investigative stop. If it had so held, there would have been no reason to remand the case to the Michigan Supreme Court for determination whether the search of the trunk was permissible under the Fourth Amendment. Rather, it would have reversed the decision in its entirety.

Here, upon the stop, there was an immediate arrest of Finney, followed by handcuffing and a "patdown" search. A stop of the vehicle and the patdown search of Finney and the passenger compartment of the

pickup may have been justified under *Terry* and *Long, supra*, but the search of the camper was not so authorized. *Hull v. State*, 613 S.W.2d 735 (Tex.Cr.App.1981); *see Johnson v. State*, 658 S.W.2d 623 (Tex. Cr.App.1983).

▓▓▓ There was no probable cause for the arrest of Finney or Emerson. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). It is basic that an arrest with or without a warrant must stand upon firmer ground than mere suspicion. *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *Wong Sun v. United States, supra.* In order for a warrantless arrest or search to be justified, the State must show the existence of probable cause at the time the arrest or search was made and the existence of circumstances which made the procuring of a warrant impracticable. *Reed v. State*, 522 S.W.2d 916 (Tex.Cr.App.1975); *Hooper v. State*, 516 S.W.2d 941 (Tex.Cr. App.1974); *Lowery v. State*, 499 S.W.2d 160 (Tex.Cr.App.1973).

▓▓▓ Since the arrest was unlawful, evidence obtained therefrom was inadmissible. A search unlawful at its inception may not be validated by what it produces. *Wong Sun v. United States, supra* (unlawful arrest not made good by finding heroin); *Delaporte v. State*, 471 S.W.2d 856 (Tex.Cr.App.1971). Taking a person into custody and to the police station for questioning on less than probable cause to arrest violates the Fourth Amendment. A *Terry* stop cannot be extended to custody. *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).

▓▓▓ Yet an unlawful arrest does not necessarily require reversal of a judgment of conviction. *Keen v. State*, 626 S.W.2d 309, 314 (Tex.Cr.App.1981); *Stiggers v. State*, 506 S.W.2d 609 (Tex.Cr.App.1974). In *Daniels v. State*, 387 S.W.2d 886, 887 (Tex. Cr.App.1965), the Court said that "[i]t has often been held by this Court that error in the admission of evidence obtained as a result of an illegal search becomes harmless where the defendant testifies and af-

firms the truths of such evidence." (citations omitted).

Having held a search of the camper unlawful, we must determine whether admission into evidence of the fruits of the search was harmful to Finney. If found to be harmless beyond a reasonable doubt, their admission would not require reversal. *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Wilder v. State*, 583 S.W.2d 349 (Tex.Cr.App.1979); *Bridger v. State*, 503 S.W.2d 801 (Tex.Cr.App.1974); *Holcomb v. State*, 484 S.W.2d 935 (Tex.Cr. App.1972); *Mireles v. State*, 114 Tex.Cr.R. 6, 23 S.W.2d 727 (1930).

### THE CONFESSION OF FINNEY

Evidence on the motion of Finney to suppress his confession was as follows. He was arrested on March 17 in Lee County for the burglary of the Stewart habitation located in Williamson County. He was taken before a magistrate in Giddings and advised of his rights pursuant to Tex.Code Cr.P.Ann. art. 15.17 (Supp.1984) and on the same date was transported to Williamson County. The following morning he was taken again before a magistrate and properly warned and advised. He did not request appointment of an attorney and was confined in the county jail.

On April 7, according to Deputy Sheriff Wilson of Williamson County, Finney asked a trustee (Emerson) to tell Wilson that he wanted to talk to him. Heeding the request, Wilson sent for Finney. After having been given the *Miranda* warnings, Finney gave a written statement in his own handwriting. The statement was witnessed by two female employees of the sheriff's office. Before signing the statement, Wilson said that Finney indicated that he understood the warnings read to him. Wilson informed Finney that he could make no promises. Wilson testified that the statement given by Finney was voluntary.

Finney testified as follows: He had been in jail about three weeks before the statement was given; he was indigent and made several requests to have an attorney appointed and was told to write to District Judge Lott. He asked Wilson, several jailers, and Justice of the Peace Hill for a lawyer. Hill appointed him a lawyer after he had been in jail for about a month but he first saw an attorney, Mr. Shortes, his trial attorney, after the statement was given. He would not have given the statement if he had been furnished an attorney and he asked Wilson if he could speak to a lawyer before giving a statement so that the lawyer could help him with same and was told by Wilson that, as he had been told before, he would have to write the judge. Finney testified further that he did not know where Williamson County was and the statement was not in his words. After he had been in the Williamson County jail for a couple of days, Deputy Kuykendall called him to his office, beat him up and told him not to tell anyone what had happened or he would be taken to the third floor where there were no occupants. A week later, Kuykendall called him down again and asked him if he was ready to cooperate. Ronnie Emerson was present at this time and told him "it would be a lot easier" if he did. Kuykendall then told Emerson to take him to a back room and tell Finney what to write on the statement form; he did so, but did not sign the statement. Kuykendall told him that if he told the truth he would see about getting him out of jail that day but if he did not do so, Kuykendall would see that he got sixty years in the penitentiary. Two weeks later Wilson called him down and asked him if he was ready to cooperate and he told Wilson that he would like to see an attorney. Wilson told him to write a letter to Judge Lott, which he did. Finney also testified that the statement which he signed, the one offered by the State, was not the one that he filled out for Kuykendall but did not sign.

On cross-examination Finney admitted that the officers in Giddings did not threaten him, mistreat him physically in any way, nor did Deputy Wilson of Williamson County. He said the first time that he saw a judge was on April 17 when he saw Judge Hill, who appointed a lawyer for him. This occurred a week or ten days after he had signed the statement. Kuykendall only beat him on one occasion—the 18th of March. He said that Wilson told him he did not have a chance in Williamson County—that he might as well sign the statement. His mistreatment by Kuykendall did not result in any blood, broken bones or any bruises. Kuykendall did not hit him very hard. He admitted that Wilson did not promise him anything and only said that he would be better off if he signed the statement. He admitted that he had been twice before convicted of felonies—burglary of a building and auto theft.

Kuykendall denied ever hitting, beating, or in any way physically abusing Finney. He said that he never made any promises to Finney. He was not involved in taking the statement from Finney on April 7. Chief Wilson was the one who did so. Kuykendall testified that Finney had refused to talk to him and he further said that Ronnie Emerson was not around when he talked to Finney.

Chief Deputy Wilson was recalled and testified that Finney never asked for a lawyer prior to making the statement and that no one helped Finney write the statement. He said that Ronnie Emerson did not tell Finney what to say.

The trial court, in its findings of fact and conclusions of law, found that the written confession met all the statutory requirements of Tex.Code Cr.P.Ann. art. 38.22 (1979 & Supp.1984); that Finney's statements that he was not taken before a magistrate when he first was brought to Williamson County and that he did not see Judge Hill until April 7th were false as shown by the magistrate's warning on March 18, which warning was signed by Finney; and that Finney had two prior felony convictions and his testimony was unbelievable. The testimony of officers Wilson and Kuykendall was believable. Finney falsely testified that he was beaten; he never made a request of Wilson for a

lawyer to help him write his statement; no promises of leniency were made to Finney and Finney was expressly told that no promises could be made to him. The conversations with Wilson that led to the statement were initiated by Finney. Finney had twice been judicially warned of his rights (once in Giddings and once in Georgetown) and was again warned by Deputy Wilson. On March 18, before Judge Hill, Finney did not request counsel and Finney never asked Wilson for a lawyer. Judge Hill did receive a request for counsel, probably on April 17, and defendant's first such request came on or about such date, after the confession had been given. The written statement of Finney was voluntarily made, and in compliance with art. 38.22, *supra*, the defendant was properly warned, was not physically mistreated, was not denied counsel nor promised leniency, and Finney knowingly and intelligently waived all his *Miranda* rights at the time he signed the statement.

## DECISION RE: VOLUNTARINESS AND ADMISSIBILITY OF CONFESSION

 The trial court found Finney's assertions as to mistreatment, promises, demand for counsel, and nonvoluntariness of the confession to be false. The court further found the statement to be in compliance with Tex.Code Cr.P.Ann. art. 38.22, *supra*, and that Finney waived his rights and voluntarily signed the confession. All of the findings of the trial court are supported by the evidence on the motion to suppress. The trial judge is the sole trier of fact and therefore his findings cannot be disturbed by this Court. *Green v. State*, 615 S.W.2d 700, 707 (Tex.Cr.App.1981); *Alonzo v. State*, 591 S.W.2d 842, 844 (Tex.Cr. App.1980); *McKittrick v. State*, 541 S.W.2d 177 (Tex.Cr.App.1976). We hold that Finney's confession was voluntary and admissible.

We have held that the detention and arrest of Finney was unlawful. Finney contends that the confession is a product of the unlawful arrest and therefore must be suppressed. *Taylor v. Alabama* 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); *Dunaway v. New York, supra; Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Green v. State, supra*. We do not agree. "A confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is sufficiently an act of free will to purge the primary taint." *Townsley v. State*, 652 S.W.2d 791, 796–7 (Tex.Cr.App.1983) (citing *Taylor v. Alabama, supra, Brown v. Illinois, supra* and *Green v. State, supra*). Several factors are to be considered in determining whether Finney's confession was obtained as a result of an illegal arrest. These factors are articulated in *Townsley v. State, supra:* (1) whether *Miranda* warnings were given, (2) the proximity of the confession to the arrest, (3) the purpose and flagrancy of the primary illegality, and (4) the presence of intervening circumstances.

*Miranda* warnings "are not alone enough to purge the taint of an illegal arrest, they are not insignificant and are a threshold requirement." *Townsley* at 797. In the instant case, the evidence is clear that Finney repeatedly received the required warnings (twice at the hands of judicial officers). As to proximity, "[t]he longer the time elapsed between confession and arrest the more likely it is that the taint of the illegal arrest will be attenuated." *Id.* Here, appellant was arrested March 17 and he confessed April 7, twenty-one days later. The confession resulted from a conference between Finney and Officer Wilson, initiated by Finney. The evidence on the purpose and flagrancy of the primary illegality is as follows. The officers had the license number and the description of the pickup seen near a fairly recent Lee County burglary. They did have the right to make a *Terry* stop and investigation; however the arrest and search were illegal and an improper violation of Finney's Fourth Amendment rights. The most important factor is the presence of intervening circumstances. Here, Finney was taken before a magistrate in Lee

County and again in Williamson County and duly warned. It was he who asked for and initiated the discussion with Officer Wilson which resulted in his confession. The original arrest and search was made by *Lee County* officers. Williamson County officers learned from the Lee County officers that they had in their possession a camera taken from the Williamson County burglary. Arrest warrants were then obtained by Williamson County officers. Twenty days elapsed before the confession was taken—by an officer who did not initiate or participate in the original arrest and search. There is no evidence that Finney was continuously interrogated.

The facts in this case are very similar to those in *Alonzo v. State, supra* at 847 where the court held that "a confession otherwise shown to be voluntary is not rendered inadmissible because the accused was under arrest or in custody at that time, even though the arrest may have been under invalid process or without legal right." (citations omitted). Appellant relies on general principles stated in *Dunaway v. New York, supra; Ussery v. State*, 651 S.W.2d 767 (Tex.Cr.App.1983); *Duncan v. State*, 639 S.W.2d 314 (Tex.Cr.App.1982); and *Green v. State, supra.* In *Ussery*, the confession was taken within two hours after the illegal arrest; in *Duncan*, the confession was taken within three hours after arrest; in *Dunaway*, only two hours elapsed between arrest and confession. It is our holding that Finney's confession was voluntary, an act of his own free will and was not the result of an exploitation of his arrest by Lee County officers. We further hold that the State discharged its burden of showing that any connection between the arrest and the statement had been so attenuated as to dissipate any taint. *Brown v. Illinois, supra; Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939); *Alonzo v. State, supra.* The confession was voluntary and admissible.

## ADMISSION OF EVIDENCE FROM SEARCH HARMLESS

Having upheld the confession and its admissibility, we hold that the admission into evidence of the items discovered in the search of the camper was harmless. Proof of the Williamson County burglary, one day before Finney's arrest, and the items taken, was made by the testimony of Stewart, the owner of the premises. A pickup meeting the description of and bearing the license number of the one being driven by Finney when arrested was seen to be leaving the vicinity of the burglarized premises in Williamson County. In Finney's confession he admits that he burglarized a residence in Williamson County and had taken various items shown to have been the same ones taken in the Stewart burglary. The admission of tainted evidence may be harmless beyond a reasonable doubt. *Harrington v. California, supra; Wilder v. State, supra* at 359; *Bridger v. State, supra; Mireles v. State, supra.* As noted, Finney's voluntary confession admitted the taking of the same items which the owner testified were taken in the burglary. We hold that the admission in evidence of the items seized from the camper was harmless. As to other items, found in the search of Emerson's apartment in Austin, they were admitted in the absence of timely objection by Finney. He cannot, therefore, complain. In his confession Finney admits that he and Emerson went to Emerson's apartment after the burglary. Finney had no standing to complain of the search of Emerson's apartment because he is not shown to have any right of occupancy therein, nor right to control such apartment, nor any expectation of privacy therein. *See Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

In his sixth ground of error, Finney alleges that the trial court erred in refusing to instruct the jury in accordance with Tex.Code Cr.P.Ann. art. 38.23 (1979) as to the validity of the search. In view of our resolution of the arrest and search, we hold it was not error to refuse such charge. In addition the facts surrounding the arrest and search were undisputed. Only where an issue of fact is created by the evidence

concerning the validity of the search is the court required to charge the jury thereon. *Merriweather v. State*, 501 S.W.2d 887, 891 (Tex.Cr.App.1973).

In grounds of error seven, eight and nine, Finney contends that the trial court erred in admitting a pen packet to prove his prior conviction. He cites no authority to support his contention. He argues only that they were not in compliance with Tex.Rev.Civ.Stat.Ann. art. 3731a (Supp.1984). We have examined the pen packet and find it to be properly certified. Finney's complaint seems to be that the clerk certified to unsigned copies of the judgment and sentence as they appeared in the minutes of the court. If so, such contention is without merit. *Campbell v. State*, 502 S.W.2d 736 (Tex.Cr.App.1973); *Gutierrez v. State*, 456 S.W.2d 84 (Tex.Cr. App.1970).

In ground of error ten, Finney argues that the trial court erred in refusing to grant his motion for mistrial "relating to the unexpected intrusion of a parole officer during the punishment phase of the trial." The event of which Finney complains occurred as the jury was leaving the courtroom at the punishment phase of the trial. A person, later identified at the hearing on the motion for mistrial as a representative of the Board of Pardons and Paroles, entered the courtroom before the jury left, approached Finney, asked him "Are you Finney?", obtained an affirmative reply, and handed Finney a document. At the time of the occurrence, the parole officer had in his hand a large notebook with the seal of the Board and letters approximately one-half inch high imprinted thereon, reading "Texas Board of Pardons and Paroles, 1981 Parole Officer's Training Project, Criminal Justice Center, Continuing Legal Education, Sam Houston State University." We note that no motion was made by appellant for the court to instruct the jury to disregard the incident. The court, in overruling Finney's motion for instructed verdict stated:

I'll state that whatever did occur when Walter Crouch [the parole officer] came into the courtroom that it was not, in my opinion, of sufficient gravity to cause any prejudice to the defendant, that the jury was in the process of leaving the courtroom at the time, and I didn't hear anything and I didn't observe anything that would or could have prejudiced this defendant; further, the notebook which Walter Crouch was carrying, the letters on it were not of sufficient height to where I could read them from where he was standing, over there to the bench where I'm seated, nor from the jury box. I've attempted to go there and see if they could be read. I wear glasses. I don't have the best eyes in the world, but I can see, and I certainly could not read those letters from the jury box, and I don't know of any way that this episode could have prejudiced the rights of the defendant in this case sufficiently to require a mistrial. Consequently the motion for mistrial is overruled.

Finney argues that the event was so prejudicial that the only conceivable remedy would be to grant a mistrial. We agree with the trial court that the incident was not of sufficient gravity to prejudice Finney. The court found that the words on the notebook could not be read from the jury box. There is no proof that the jury saw the notebook or realized that the person was from the Board of Pardons and Paroles. Moreover, the jury had heard evidence of two prior felony convictions of Finney. There is no showing of such prejudicial conduct as would require mistrial. An instruction to the jury to disregard the matter would have sufficed. Such an instruction was not requested. No reversible error is shown.

The judgment of the trial court is affirmed.