

# NUMBERS 13-19-00626-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

**JOSE LUIS GARCIA JR.,**                                             **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                              **Appellee.**

### On appeal from the 398th District Court
### of Hidalgo County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Tijerina**
**Memorandum Opinion by Chief Justice Contreras**

Appellant Jose Luis Garcia Jr. was convicted of tampering with physical evidence, a third-degree felony, and he was sentenced to eight years' imprisonment. *See* TEX. PENAL CODE ANN. § 37.09. On appeal, he contends that the trial court erred by denying his pre-trial motion to suppress statements he made to police. We conclude that the

statements should have been suppressed, but that the error was harmless in light of other evidence adduced at trial. Accordingly, we affirm.

## I. BACKGROUND

Appellant was indicted on counts of capital murder and tampering with physical evidence, both related to the fatal shooting of 17-year-old Chayse Olivarez on or about July 30, 2017. *See id.* §§ 19.03(a)(3), 37.09(d)(1).[1] Appellant filed a "Motion to Suppress Statements" and a "Motion to Determine Admissibility of Statements" seeking to exclude evidence of incriminating statements he made to police during the investigation.

### A. Traffic Stop

At a pre-trial suppression hearing, Texas Ranger Eric Lopez testified that the Rio Grande City Police Department asked for his assistance in investigating Olivarez's disappearance. Lopez interviewed several people, including Martin Ramirez, who was the last to see Olivarez alive. Ramirez told Lopez that, on the day Olivarez disappeared, he drove Olivarez and 16-year-old Phillip Selvera "to an abandoned house" at Selvera's request. Selvera told Lopez that "he was hired by [appellant] to lure [Olivarez] to an abandoned house in Roma." According to Lopez, Selvera said he was paid $10,000 for this. Selvera told Lopez that he knew appellant from school.

Rio Grande City Police Department officer Ryan Rosa testified that, on August 11, 2017, he received a text message from his supervisor to be on the lookout for appellant's gray Chevrolet truck. He said he was advised "that if we were able to identify the subject [appellant]," then "backup would arrive there." Rosa observed the truck at Rio Grande

---

[1] The tampering charge alleged that appellant, "knowing that an offense had been committed, namely, Murder, intentionally and knowingly[] concealed physical evidence[] with intent to impair its availability as evidence in any subsequent investigation or official proceeding related to the offense." *See* TEX. PENAL CODE ANN. § 37.09(d)(1).

City High School, where appellant was a student and had been attending football practice. Later, Rosa observed the vehicle going "45 in a 35 per hour zone and driving on the improved shoulder"; therefore, he initiated a traffic stop. Video recordings of the traffic stop were entered into evidence and played for the trial court. Rosa issued warnings to appellant for the traffic infractions[2] and asked appellant to step out of the truck. Appellant complied and then consented to a search of his truck, though no search was performed.

Several other officers were already at the scene. Rosa testified: "The individual [appellant] was asked of his own free will if he was willing to be transported in regards to the disappearance of the subject [Olivarez], which he willingly by himself decided." Rosa acknowledged that, though his bodycam and patrol unit camera were recording the traffic stop, appellant's statement that he was "willing" to be transported to the sheriff's office for questioning was not recorded. Rosa repeatedly agreed that his bodycam was "not working" during the time appellant made that statement, and he suggested that might have been due to a "glitch" or a "malfunction." On cross-examination at trial, Rosa admitted that he "turned [the bodycam] off after my first contact with [appellant] when I made contact in regards to the violation," and that he turned the bodycam back on after appellant made his alleged statement of willingness to be transported for questioning.

After appellant allegedly agreed to go to the sheriff's office, Rosa handcuffed appellant. Starr County Sheriff's Deputy Gumaro Trevino then placed appellant in his patrol unit. Rosa testified that it is the department's "policy" that, whenever any person is being transported in a police unit, that person "shall be placed in hand restraints for the

---

[2] An operator of a motor vehicle may drive on an improved shoulder for certain purposes, including "to decelerate before making a right turn," as long as "that operation is necessary and may be done safely." TEX. TRANSP. CODE ANN. § 545.058(a). The alleged traffic infractions were not captured on the video recordings.

3

safety of myself and others." Rosa stated that, if appellant had declined to go to the sheriff's office voluntarily, he would have been released because "[t]here is nothing I have to detain him or arrest him." However, he did not tell appellant that he was free to leave. Moreover, Rosa agreed that, at the end of the video recording of the traffic stop, he was "giving an instruction for somebody to detain [Garcia]."[3]

Trevino testified that he was informed on August 11, 2017, that appellant "was a suspect to a murder case and a motor stop needed to be conducted on [his] vehicle and [appellant] taken to the sheriff's office." He agreed that the "overall goal that day was to stop him, hold him, not release him and question him." He also agreed that, if police "would not have found probable cause and allowed [appellant] to drive all the way home, that would have been against" the instructions he was given.[4] While Trevino was transporting appellant to the sheriff's office, appellant asked "why was [sic] there so many cops at the scene"; Trevino replied "[t]hat they would be talking to him shortly." Appellant also asked "if he could call somebody to get his vehicle"; Trevino said "no" and instead called for a wrecker to pick up the vehicle and deliver it to the sheriff's office. Trevino later agreed that he "really didn't have the right to impound the vehicle because there was no arrest effectuated on [appellant]." Trevino did not tell appellant that he was under arrest. He agreed that appellant would not have been able to physically get out of the patrol unit, but he stated at the suppression hearing that he would have let appellant go if appellant had asked.[5] He agreed that it is department policy to handcuff all individuals being

---

[3] Rosa's "instruction for somebody to detain [Garcia]" is not audible on the video recording.

[4] On cross-examination at the suppression hearing, Lopez agreed that the traffic stop was "a pretextual stop just to get [appellant] to go to the interview."

[5] At trial, Trevino conceded that, "if [appellant] would have requested to be released, I sure would have made some calls and advised my supervisors as to what was going on" before releasing him.

transported in police units. At trial, Trevino agreed that a person who is handcuffed and placed in the back of a patrol unit, without the ability to leave, is "in essence" under arrest.

## B. Interrogation

Lopez testified at the suppression hearing that he interviewed appellant at the sheriff's office beginning at 12:42 p.m. on August 11, 2017. Appellant was seventeen years old at the time. A video recording of the interview was entered into evidence and played for the trial court. When appellant was first brought into the interview room, he was still handcuffed. Lopez orally advised appellant of his *Miranda* rights and appellant said that he understood those rights. The video recording of the interview reflects that, after appellant stated he understood his rights, Lopez asked appellant, "Are you good to talk to me, brother?" Appellant replied, "Yeah, sure." Appellant did not explicitly state that he was waiving his rights. Lopez agreed that appellant was not "free to go," but he denied that he had "already made up [his] mind" to charge appellant with capital murder before the interview. When asked whether appellant was in custody when he was first brought to the interview room, Lopez testified: "He was detained at that moment."

Lopez denied that he promised appellant anything in exchange for his statement. However, at trial, Lopez agreed that he promised to "help" appellant over eighty times during the interview.[6] Lopez also denied that appellant ever asked for an attorney or for

---

[6] The following colloquy occurred at trial:

| Q [Defense counsel] | I mean, during the interview, you're not allowed to tell them, Listen, help me and I can help you? You're not allowed to tell them that? |
| A [Lopez] | Yes, correct. You're not allowed. |
| Q | But you did that, you did that. I went back and counted that almost 80 times, if not more, Mr. Lopez, over and over and over again, I can help you, I can help you, I can help you, I can help you? |

5

the questioning to terminate. However, he acknowledged that, at about an hour and a half into the interview, appellant asked: "I can't get a lawyer or something, to help me out here?" Lopez replied: "What do you need a lawyer for?" Lopez continued: "Where do you come up with all this? I mean, you have every right to—to have one, but we're just talking, bro." The following exchange then appears on the video recording:

| | |
|---|---|
| Appellant: | To be honest with you, officer, . . . today was a really hardcore day [in] football. I'm stressed out. I just want to go home, want to take a shower, . . . and take a little nap because I woke up at five in the morning. |
| Lopez: | Okay. Why is that going to change? . . . It's not bedtime. It's not shower time. Stop, bro. Stop. C'mon man. I gave you truth, and you're already [unintelligible[7]]. Give me some. |

A short time later, appellant told Lopez:

I want to help you too, you know. Just, it's really hard to say something [unintelligible]. And, I know that's frustrating, especially for you guys. You

| | |
|---|---|
| A | Yes, sir. |
| Q | Remember that? |
| A | Yes. |
| Q | Right. But that's not part of the Miranda warnings, is it? |
| A | No, sir, of course not. |
| . . . . | |
| Q | Okay. Have you ever heard any challenge of—like that in court where you're not supposed to use a false promise, a false inducement to get a statement? |
| A | No, sir. |
| Q | You've never heard that before? |
| A | You can't use false promises. There was no promises on my end. |
| Q | Yeah. The promise was you were going to help. |
| A | Okay. Yes, sir. |
| Q | You remember that? |
| A | Yes, sir. |

[7] At trial, a transcript of the video recording of the interview was apparently provided to the jury and to Lopez. Lopez testified that there were errors in the transcript, but did not provide any details. The transcript was not offered into evidence and does not appear in the record. We have transcribed relevant portions of the video for purposes of this opinion.

know? And, like, I just don't want to talk about that. You know? Like, I know *you* do, but I don't. I just . . . I just want to go home. Right now, I'm scared, because I'm in this box, and I'm with a Texas Ranger, I know you know all those moves and stuff, to take me down.

Appellant also asked Lopez: "How long can I be contained [sic] for? Six hours, right?" Lopez replied: "There is no hours. There is no limit."

Lopez explained at the suppression hearing that appellant did not "clarify" why he needed a lawyer, so he proceeded with the interview. Lopez further conceded that he did not initially advise appellant why he was being interviewed; instead, he only told appellant he was a murder suspect at the end of the interview. Lopez agreed that he repeatedly told appellant that he already knew the facts—for example, Lopez often said "I already know, just tell me."

Lopez said he had an audio recording device on the table of the interview room, and when he turned it off at appellant's request, appellant "began to open up." Appellant later asked Lopez to remove his recording device from the room, and Lopez did so. When appellant asked if there were any other recorders in the room, Lopez replied: "I threw out my audio recorder, bro, for you. . . . It's just me and you. It stays in this room. . . . Between us." Appellant asked whether Lopez was wearing a microphone; Lopez replied: "Stop. How much more do I need to prove to you, bro? I am doing everything I can for you." At the suppression hearing, Lopez acknowledged that the "main" video and audio recording device in the interview room operated throughout the interview.

Lopez testified that, at around 3:22 p.m., appellant whispered to him that he killed Olivarez.[8] Appellant also admitted that he paid Selvera $10,000 to "stay quiet." He said

---

[8] This admission is not audible on the video recording.

he got the money from selling baseball and basketball cards. The interview continued for about another hour, after which Lopez took appellant to walk through the crime scene at the abandoned house. The walkthrough was recorded by a bodycam worn by Trevino; the video recordings were entered into evidence and played for the trial court.[9] Appellant led officers to the abandoned house and showed them the room where he hid before Olivarez arrived. Appellant then showed the officers where he shot Olivarez. He stated he shot two or three times at Olivarez's head. Appellant explained that after he shot Olivarez, Selvera placed the dead body in a pit and appellant and Selvera covered the pit with a piece of wood. Appellant said he told Selvera to "take care of everything" after that; he denied that he burned Olivarez's body or that he saw Selvera burn the body. Eventually, appellant conceded that Selvera's friend burned the body the day after the murder. Later in the walkthrough, another officer told appellant that police had enough evidence to convict appellant of Olivarez's murder.

Appellant then led Lopez and other officers to the location on the Rio Grande where he threw the .45-caliber handgun that he used to shoot Olivarez, and where Selvera disposed of Olivarez's cell phone. Appellant first told Lopez that he got the gun from a friend; later, he said he obtained it from his father. Police recovered the gun from the river and a bullet casing from the murder scene. Lopez testified that the casing matched the weapon according to forensic analysis. While on the way back to the sheriff's office, Lopez advised appellant that he could not go home because he was under arrest.

---

[9] During the walkthrough of the crime scene, appellant repeatedly asked for the bodycam not to be pointed at him while he talked.

On October 28, 2017, the trial court orally denied the motion to suppress.[10] Trial on the merits began the following day.

## C. Psychiatrist Testimony

On the sixth day of trial, appellant called Tomas A. Gonzalez, M.D., a forensic psychiatrist, as an expert witness. Gonzalez testified that he was hired by appellant's counsel and met with appellant several times in 2019. At the first meeting, he administered an examination and determined that appellant did not have a major mental illness. At the second meeting, appellant discussed his August 11, 2017 interview with Lopez. According to Gonzalez, appellant felt that he was "deceiv[ed]" by Lopez into providing incriminating information. Gonzalez stated he viewed the recording of the interview and was concerned that Lopez was "lying" to appellant and "giving him false assurances that he was going to help him and he was going to make everything better; something a nervous 17-year-old was hoping to get from an adult." He stated that a "17-year-old is not a fully developed adult. Their brains are still highly influenced. They are impressionable. And they can be convinced easily."

According to Gonzalez, at their final meeting on October 23, 2019, appellant described his relationship with Olivarez and the events surrounding Olivarez's death.[11] Appellant told Gonzalez that he and Olivarez were friends in the eighth and ninth grade,

---

[10] The court stated:

I'm going to confess that this is not an easy decision for the Court given the—the issues involved in this whole process. But at the end of the day, this was a vehicular stop, and the law favors the State in their argument at the conclusion. Therefore, the Court is going to—based on the totality of the circumstances, I'm going to say the stop was reasonable, and I'm going to deny the motion to suppress. That will be the ruling of the Court.

[11] The State did not object to Gonzalez's testimony on hearsay, Confrontation Clause, or any other grounds.

but when Olivarez started using "cocaine and other drugs," appellant "tried to keep away from him." In 2017, when they were in the tenth grade, Olivarez texted appellant and asked to purchase marijuana brownies and bars of Xanax. Appellant told Gonzalez that, when he went to Olivarez's house to complete the sale, Olivarez kept the drugs but brandished a gun and refused to pay. Olivarez threatened appellant and told him not to tell anyone about what happened. Later, appellant's classmates "taunted" and "mocked" appellant about being "robbed" by Olivarez. Olivarez later told appellant: "I can have you and your family dead in one day."[12]

Appellant told Gonzalez that he planned to fight Olivarez, and that he asked Selvera "to find a place" for the fight. Selvera advised appellant that Olivarez would be armed and "might kill you." Gonzalez testified:

> So [appellant] gets a pistol from the gun safe at his parent's home, not planning to use it. He was planning on fighting only. [Selvera] said that [Olivarez] was willing to go. And the pretense was to go smoke pot. They were going to go smoke pot and that's why [Olivarez] would go.
>
> . . . .
>
> So they find a location. [Appellant] and [Selvera's friend] get there and [appellant] hides and says, "I want to sucker-punch this guy. I want to sucker-punch [Olivarez]."
>
> . . . .
>
> In the twenty minutes that they are waiting for [Olivarez], [appellant] starts a death spiral of very dark, negative, anxious thoughts. . . . And he is in that moment very, very scared. He says, "Either way something bad is going to happen." And the next thing he remembers is [Olivarez] fell to the ground.

At the end of the meeting, appellant told Gonzalez: "I saved my family. No one deserves to die, but I saved my family."

---

[12] According to Gonzalez, appellant believed that Olivarez's father belonged to a gang.

Gonzalez testified that "[t]here is something called disassociation" which may be suffered by trauma victims, in which "the brain checks out." He described it as "[w]hen someone is so anxious, so overwhelmed, so scared their brain protects them from that moment, separates out and the person acts without feeling it." He said, "based on [a] reasonable amount of medical probability, [appellant] did disassociate."

The following colloquy later occurred on cross-examination:

| | |
|---|---|
| Q. [Prosecutor] | And in your evaluation of this case, did [appellant] tell the ranger what the ranger wanted to hear or did he tell the ranger how he had killed [Olivarez]? |
| A. [Gonzalez] | It seems like both. |
| Q. | And in fact, he even told him what he did with the weapon? |
| A. | Right. |
| Q. | That how [sic] he threw it in the river? |
| A. | Right. |
| Q. | How the body was burned? |
| A. | It's all there in the video.[13] |

Gonzalez acknowledged that appellant admitted to Lopez that he had planned the murder four days beforehand. He also conceded that he was relying on appellant's version of events and did not independently verify anything appellant told him.

## D. Verdict

The jury acquitted appellant of the lesser-included offense of murder, *see id.* § 19.02(b), but it convicted him of tampering with evidence and sentenced him as set forth above. This appeal followed.

---

[13] Defense counsel did not object to these questions.

11

## II.   DISCUSSION

By a single multifarious issue, appellant argues the trial court erred by denying his motion to suppress because: (1) he was "unlawfully seized" in violation of his federal and state constitutional rights; (2) he was "unlawfully denied his right to remain silent" and his right to counsel under the Fifth and Sixth Amendments; (3) the trial court erred by finding that the traffic stop and detention were reasonable; and (4) his statements were the "fruit of the poisonous tree planted by the purposeful and flagrant overreaching behavior" of law enforcement, in violation of his constitutional due process rights and the code of criminal procedure.

### A.   Standard of Review

We review a trial court's ruling on a motion to suppress evidence for an abuse of discretion under a bifurcated standard. *Wells v. State*, 611 S.W.3d 396, 405 (Tex. Crim. App. 2020). We afford almost total deference to the trial court's findings of fact as long as they are supported by the record. *State v. Granville*, 423 S.W.3d 399, 404 (Tex. Crim. App. 2014). The same standard is applied when reviewing the trial judge's application of law to questions of fact when resolution of those questions depends on an assessment of credibility and demeanor. *Wells*, 611 S.W.3d at 405–06; *Johnson v. State*, 414 S.W.3d 184, 192 (Tex. Crim. App. 2013); *see Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007) (noting that the trial court "is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony" when entertaining a motion to suppress). On the other hand, mixed questions of law and fact which do not hinge on assessments of credibility or demeanor are reviewed de novo. *Wells*, 611 S.W.3d at 405–06.

12

Because the trial court made no explicit fact findings and neither party timely requested findings and conclusions, we will infer the necessary fact findings that would support the trial court's ruling if the evidence, viewed in the light most favorable to the ruling, supports such findings. *Lerma v. State*, 543 S.W.3d 184, 190 (Tex. Crim. App. 2018); *State v. Kelly*, 204 S.W.3d 808, 819 (Tex. Crim. App. 2006). We will sustain the trial court's ruling if it is correct under any applicable theory of law. *Wells*, 611 S.W.3d at 406.

## B.    Illegal Arrest

Appellant principally argues that his statements to police should have been suppressed because they were the product of an illegal seizure without probable cause. The United States and Texas Constitutions both protect against unreasonable seizures. *See* U.S. CONST. amend. IV; TEX. CONST. art. I, § 9. And "evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America" is generally inadmissible in a criminal case. TEX. CODE CRIM. PROC ANN. art. 38.23. In particular, if a defendant is in custody as the result of an illegal arrest or detention, both the Fourth Amendment and state law require evidence found as the result of the illegal arrest to be excluded. *See id.*; *Johnson v. State*, 878 S.W.2d 164, 168–69 (Tex. Crim. App. 1994).

The law recognizes three distinct types of police-citizen interactions: (1) consensual encounters, which do not implicate the Fourth Amendment; (2) investigative detentions, which are Fourth Amendment seizures of "limited scope and duration" and which must be supported by a reasonable suspicion of criminal activity; and (3) arrests, which are reasonable under the Fourth Amendment only if supported by probable cause.

*Wade v. State*, 422 S.W.3d 661, 667 (Tex. Crim. App. 2013). Probable cause exists only if, at the time the arrest is made, the facts and circumstances within the arresting officer's knowledge, or of which the officer has reasonably trustworthy information, are sufficient to warrant a prudent person to believe that the arrested person had committed or was committing an offense. *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009).

In determining whether a police encounter is an investigative detention or has escalated to a full-blown custodial arrest, courts consider:

> the amount of force displayed, the duration of a detention, the efficiency of the investigative process and whether it is conducted at the original location or the person is transported to another location, the officer's expressed intent—that is, whether he told the detained person that he was under arrest or was being detained only for a temporary investigation, and any other relevant factors.

*State v. Sheppard*, 271 S.W.3d 281, 291 (Tex. Crim. App. 2008); *see Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996).

Here, Rosa testified that he stopped appellant's truck because he observed appellant committing traffic offenses—namely, exceeding the speed limit and driving on an improved shoulder. *See* TEX. TRANSP. CODE ANN. §§ 545.058(a), 545.352. It was the trial court's prerogative to believe Rosa's testimony. *See Wiede*, 214 S.W.3d at 24–25. Therefore, the initial traffic stop was reasonable, regardless of Rosa's subjective intent. *See Matthews v. State*, 431 S.W.3d 596, 603 (Tex. Crim. App. 2014) (noting that a police officer has reasonable suspicion to make a traffic stop "if he has specific, articulable facts that, combined with rational inferences from those facts, would lead him reasonably to conclude that the person detained is, has been, or soon will be engaged in criminal activity"); *Garcia v. State*, 827 S.W.2d 937, 942 (Tex. Crim. App. 1992) (holding that, "where police officers are objectively doing what they are legally authorized to do . . . the

results of their investigations are not to be called in question on the basis of any subjective intent with which they acted").

It is undisputed, however, that the purpose for the traffic stop was completed as soon as Rosa gave appellant warnings for the alleged infractions. "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *see Davis v. State*, 947 S.W.2d 240, 243 (Tex. Crim. App. 1997) (noting that, "once the reason for the stop has been satisfied, the stop may not be used as a 'fishing expedition for unrelated criminal activity'" (quoting *Ohio v. Robinette*, 519 U.S. 33, 41 (1996) (Ginsburg, J., concurring))). Rosa and Trevino both testified that, aside from the traffic infractions, there were no specific and articulable facts known to police, at the time appellant was handcuffed and transported to the sheriff's office, which would have supported either a temporary investigatory detention or a full arrest. Accordingly, if appellant was in fact seized—regardless of whether the seizure is characterized as a temporary investigative detention or a full arrest—that seizure was unlawful. *See Davis*, 947 S.W.2d at 244.

In arguing that appellant was not in fact seized, the State contends that he voluntarily accompanied officers to the sheriff's office for questioning. In this regard, Rosa testified at the suppression hearing as follows: "[Appellant] was asked of his own free will if he was willing to be transported in regards to the disappearance of [Olivarez], which he willingly by himself decided."[14] Even though appellant's alleged statement of willingness

---

[14] Although this testimony is arguably ambiguous, appellant does not dispute that the essence of Rosa's statement is that appellant voluntarily agreed to go to the sheriff's office for questioning.

to submit to questioning was conspicuously absent from the video of the traffic stop, the trial court was again within its discretion to believe Rosa's testimony and to determine, based on that testimony alone, that appellant was not "seized," for Fourth Amendment purposes, at the scene of the traffic stop. *See Wiede*, 214 S.W.3d at 24–25; *see also Wade*, 422 S.W.3d at 667 (noting that a consensual encounter with police is not a Fourth Amendment seizure).[15]

Nevertheless, merely because an encounter begins with the subject's consent does not mean that it remains consensual in perpetuity.[16] For example, an encounter is no longer consensual when an officer, through physical force or a show of authority, restrains a person's liberty. *United States v. Mendenhall*, 446 U.S. 544, 553–54 (1980); *see State v. Castleberry*, 332 S.W.3d 460, 466–67 (Tex. Crim. App. 2011). We review de novo the question of whether a consensual encounter has advanced into a detention. *Wade*, 422 S.W.3d at 669. In making that assessment, there are no bright-line rules. *Castleberry*, 332 S.W.3d at 467. Rather, we examine the totality of the circumstances to determine whether a reasonable person would have felt free to ignore the officer's request or to terminate the consensual encounter. *Id.*; *see Mendenhall*, 446 U.S. at 554 ("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have

---

[15] Rosa testified at trial that he turned off his bodycam before appellant made the alleged statement of willingness to submit to questioning, and that he turned it on afterward. Moreover, Trevino testified at trial that he would have consulted his superiors before releasing appellant. This testimony was not before the trial court at the suppression hearing. Review of a suppression ruling is ordinarily "limited to the record produced at the suppression hearing"; however, "when the parties subsequently re-litigate the suppression issue at the trial on the merits, we consider all evidence, from both the pre-trial hearing and the trial, in our review of the trial court's determination." *Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007).

[16] The State argues the encounter was entirely consensual and appellant argues the encounter was entirely a seizure for constitutional purposes. Neither party suggests that appellant's detention was initially consensual but at some point advanced into a seizure.

16

believed that he was not free to leave."); *Johnson v. State*, 912 S.W.2d 227, 236 (Tex. Crim. App. 1995) ("[T]he seizure of the citizen has not occurred until a reasonable person would believe he or she was not free to leave, and that person has yielded to the officer's show of authority or been physically forced to yield."). The test to determine whether a person has been detained is objective and does not rely on the subjective belief of the detainee or the police. *Furr v. State*, 499 S.W.3d 872, 878 (Tex. Crim. App. 2016). The officers' conduct is the most important factor in determining whether a police-citizen interaction is a consensual encounter or a Fourth Amendment seizure. *Castleberry*, 332 S.W.3d at 467.

When considered objectively, the conduct of law enforcement in this case would have made unequivocally clear to a reasonable person in appellant's position that they were not free to leave. First, at least four marked police cars and at least four uniformed officers appeared at the scene of the traffic stop—a fact remarked upon by appellant while being transported for questioning. *See Mendenhall*, 446 U.S. at 554 ("Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."). Second, police handcuffed appellant before he was placed in Trevino's patrol unit, and appellant remained in handcuffs throughout the ride to the sheriff's office, despite the fact that appellant had allegedly given his consent to submit to questioning. The handcuffs were removed only after appellant was placed in the interview room and officers physically obstructed the exit. The State argues without reference to authority that

17

"[a]ppellant being handcuffed only during transport is not conclusive of an arrest." That may be so,[17] but the fact that appellant was handcuffed throughout his transportation to questioning is undeniably and strongly probative of the question before us here—i.e., whether a reasonable person would have felt "free to leave" considering the totality of the circumstances. *See Mendenhall*, 446 U.S. at 554; *Castleberry*, 332 S.W.3d at 468.[18] Third, appellant was placed in the back seat of a patrol unit from which it was impossible to physically escape. Fourth, Trevino explicitly informed appellant that he could not call someone to retrieve his truck, which Trevino conceded would have been appropriate only if appellant had been arrested. Finally, appellant twice told Lopez that he "just want[ed] to go home," and Lopez essentially refused those requests by deflecting and instructing appellant to "stop." Instead, Lopez informed appellant that there is "no limit" to the length of time he may be detained.

Based on these uncontroverted facts, in light of all the circumstances, a reasonable person in appellant's position would have believed he was not free to leave and was not free to terminate the interview. *See Johnson*, 912 S.W.2d at 236. We therefore conclude that, although appellant's encounter with police may have been consensual initially, it advanced into a "seizure" for Fourth Amendment purposes before appellant made any incriminating statements. Because there was no warrant, reasonable suspicion, or

---

[17] In *Balentine v. State*, 71 S.W.3d 763 (Tex. Crim. App. 2002) and *Rhodes v. State*, 945 S.W.2d 115 (Tex. Crim. App. 1997), the Texas Court of Criminal Appeals held that the subject was not "under arrest" even though the subject was handcuffed and/or secured in a police car. However, the court held in both of those cases that the encounter was an investigative detention, and an investigative detention is also a "seizure" for Fourth Amendment purposes. *See Wade v. State*, 422 S.W.3d 661, 667 (Tex. Crim. App. 2013).

[18] According to Rosa and Trevino, it is the "policy" of the Starr County Sheriff's Office to handcuff any person transported in a police unit for any reason. This is immaterial to the question of whether appellant's encounter with police constituted a "seizure" for Fourth Amendment purposes.

18

probable cause to support such a seizure, the trial court erred in denying the motion to suppress.

**C.      Attenuation**

The State contends that, even if the trial court erred in denying appellant's motion to suppress, appellant's incriminating statements were "sufficiently attenuated" from the arrest so as to make those statements admissible. Under the "fruit of the poisonous tree" doctrine, evidence obtained directly or indirectly from an illegal seizure will be inadmissible. *See Wong Sun v. United States*, 371 U.S. 471, 484 (1963); *State v. Iduarte*, 268 S.W.3d 544, 550 (Tex. Crim. App. 2008). "Evidence is not classified as a fruit requiring exclusion, however, merely because it would not have been discovered 'but for' the primary violation." *Iduarte*, 268 S.W.3d at 550. "Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 550–51 (internal quotations omitted).

> Evidence that is sufficiently attenuated from the unlawful arrest is not considered to have been obtained therefrom. The prosecution carries the burden of proving attenuation. In deciding whether appellant's confession, which was given following an illegal arrest, was sufficiently attenuated as to permit the use of the confession at trial, we are to consider the following factors: (1) whether *Miranda* warnings were given; (2) the temporal proximity of the arrest and the confession; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the official misconduct. These four factors do not necessarily carry equal weight.

*Monge v. State*, 315 S.W.3d 35, 40 (Tex. Crim. App. 2010) (internal citations omitted). We consider the factors listed in *Monge* in turn.

First, *Miranda* warnings "are an important and necessary factor in determining whether the confession is obtained by exploitation of an illegal arrest." *Id.*; *see Miranda v.*

19

*Arizona*, 384 U.S. 436, 479 (1966). "However, the fact that a *Miranda* warning has been given is not sufficient to break the causal connection between an illegal arrest and the confession." *Id.* Here, Lopez administered statutory *Miranda* warnings to appellant after he was placed in the interview room and unhandcuffed. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(a). Appellant, then a 17-year-old high school student, orally acknowledged that he understood his rights but did not explicitly waive them, either orally or in writing. "In some cases, a waiver can be clearly inferred from the actions and words of the person interrogated." *Joseph v. State*, 309 S.W.3d 20, 24–25 (Tex. Crim. App. 2010) (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). But "a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." *Id.* at 24 (citing *Miranda*, 384 U.S. at 475). Consideration of this factor weighs slightly in favor of attenuation.

Second, less than three hours elapsed between the time appellant was brought into the interview room and the time he first confessed to Lopez. Consideration of this factor weighs slightly against attenuation. *See Monge*, 315 S.W.3d at 41 (noting that "[t]emporal proximity is generally not a strong determining factor" but "if there is a short period of time (under three hours) between the illegal arrest and the confession, this factor will weigh in favor of appellant").

Third, there were no intervening circumstances which would "break the causal connection between the illegal arrest and the confession so that the confession is sufficiently an act of free will to purge the primary taint." *Townsley v. State*, 652 S.W.2d 791, 796–97 (Tex. Crim. App. 1983). In particular, appellant was not confronted with significant incriminating evidence which could have precipitated an admission without

regard to his custody status. *Cf. Monge*, 315 S.W.3d at 42 (finding taint of illegal arrest was attenuated where appellant's "confession flowed at least as much from being confronted with his co-defendant's untainted confession as from his arrest"); *Dowthitt*, 931 S.W.2d at 262 (same where appellant's "statements appeared to flow as much from [his] precustodial admission to being present at the murders as from his custody status"). The State argues that appellant confessed to the murder "shortly []after" being advised that Lopez had spoken with Selvera, but this is not supported by the evidence. The State further argues that appellant appears relaxed during the interrogation, appellant had access to restrooms and food, and police acquiesced to appellant's request to have his handcuffs moved to the front. We cannot agree that these are "intervening circumstances" of the sort that would break the causal connection between the illegal arrest and appellant's confession. Consideration of this factor weighs against attenuation.

Finally, the "purpose and flagrancy of official misconduct" is "one of the most important factors to be considered." *Monge*, 315 S.W.3d at 42 (citing *Bell v. State*, 724 S.W.2d 780, 789 (Tex. Crim. App. 1986)).

> The clearest indications of attenuation should be required where police conduct is the most flagrantly abusive. Such conduct includes: reliance on factors in making an arrest which were so lacking in indicia of probable cause as to render belief in its existence entirely unreasonable; an arrest effectuated as a pretext for collateral objectives; or an arrest which is unnecessarily intrusive on personal privacy. Other jurisdictions have found unattenuated taint when the arrest was made without any apparent justification, as part of a dragnet operation or upon a pretext, and where it appeared that the illegal arrest was for the purpose of obtaining a confession and the arrest was exploited for that purpose, as by misleading the arrestee as to the purpose for the arrest, subjecting him to continuous interrogation, or threatening him with a polygraph test.

*Bell*, 724 S.W.2d at 789–90 (internal citations omitted); *see Monge*, 315 S.W.3d at 42 (noting that "[t]his contrasts with situations in which probable cause exists" and "failure to

get an arrest warrant is a comparatively less serious misconduct").

Here, appellant was not threatened with a polygraph test, and the arrest was not unnecessarily intrusive upon appellant's personal privacy. However, the evidence clearly established that the traffic stop was performed as a "pretext for collateral objectives"— i.e., bringing appellant in for questioning and extracting a confession. *See Bell*, 724 S.W.2d at 789–90. Police did not tell appellant he was free to leave. And as stated above, the law enforcement officers unanimously testified that they had no probable cause or reasonable suspicion to detain appellant after the purpose of the traffic stop had been fulfilled. Nevertheless, Rosa testified he gave an instruction to "detain" appellant. Further, when appellant asked whether he could "get a lawyer or something to help [him] out," Lopez acknowledged appellant's right to counsel but discouraged appellant from exercising that right. Lopez also deceived appellant into believing that the interrogation was not being audio recorded. The State's conduct in this case was purposeful and flagrant. Consideration of this factor weighs heavily against attenuation.

We conclude, considering the factors set forth in *Monge*, that the State has not established that appellant's confessions were so attenuated as to "purge the primary taint" of the illegal seizure. Accordingly, appellant's confessions should have been suppressed.[19]

### D. Harm Analysis

Under Texas Rule of Appellate Procedure, if we find an error of constitutional magnitude, as here, we must reverse the conviction unless we determine "beyond a

---

[19] In light of this conclusion, we need not address appellant's sub-issue alleging he was denied his right to counsel. *See* TEX. R. APP. P. 47.1.

22

reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a). Factors we may consider in assessing harm under Rule 44.2(a) include the nature of the error, whether it was emphasized by the State, the probable implications of the error, and the weight the jury would likely have assigned to the error. *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011); *see Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000). There is no set formula for conducting a harm analysis that necessarily applies across the board to every case and every type of constitutional error. *Snowden*, 353 S.W.3d at 822 n.31.

In his brief, appellant contends that his video-recorded admissions "served as the only evidence affirmatively linking Appellant to the crime of which he was convicted." He argues that "[i]t is not only likely, but probable that the jury assigned great weight to the [admissions] during its deliberations." In response, the State argues that the admission of Gonzalez's testimony rendered any error harmless. Gonzalez testified that, according to his review of the video, appellant told Lopez that appellant threw the murder weapon in the river. Defense counsel did not object to this testimony. Even if the testimony is considered inadmissible hearsay, it has probative value because it was admitted without objection. *See* TEX. R. EVID. 802 ("Inadmissible hearsay admitted without objection may not be denied probative value merely because it is hearsay."). Appellant does not address Gonzalez's testimony in the discussion of harm in his brief.

As a general rule, the improper admission of evidence will be considered harmless if the same or similar evidence is admitted without objection at another point in the trial. *See Estrada v. State*, 313 S.W.3d 274, 302 n.29 (Tex. Crim. App. 2010) (noting that any preserved error with respect to admission of complained-of evidence was harmless in

23

light of "very similar" evidence admitted without objection); *see also* TEX. R. APP. P. 44.2(a); *Lopez v. State*, 615 S.W.3d 238, 265–66 (Tex. App.—El Paso 2020, pet. ref'd). In *Leday v. State*, the Texas Court of Criminal Appeals described two exceptions to this general rule which may apply when the defendant is the party that offers the duplicative evidence:

> One exception is that the defendant's testimony, which constituted other evidence of the fact that was proved over the defendant's objection, was impelled by the State's introduction of evidence that was obtained in violation of the law. *See Sweeten v. State*, 693 S.W.2d 454 (Tex. Crim. App. 1985); *Thomas v. State*, 572 S.W.2d 507 (Tex. Crim. App. 1978). The reason for this exception is that if the defendant's decision to testify was made in order to overcome the impact of such evidence, the testimony is tainted by the same illegality as was the prosecution's evidence. *Sweeten*, 693 S.W.2d at 457 (quoting *Harrison v. United States*, 392 U.S. 219, 223 (1968)); *Thomas*, 572 S.W.2d at 516 (same). . . . To remove itself from this exception, the State has the burden to show that its illegal action did not impel the defendant's testimony. *Sweeten*, 693 S.W.2d at 458–59; *Sherlock v. State*, 632 S.W.2d 604, 606–07 (Tex. Crim. App. 1982).

*Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) (citing *Sherlock*, 632 S.W.2d at 607). The second exception "is that the harmful effect of improperly admitted evidence is not cured by the fact that the defendant sought to meet, destroy, or explain it by introducing rebutting evidence." *Id.* (citing *Thomas*, 572 S.W.2d at 512); *see McLaughlin v. State*, 4 S.W.2d 54, 54 (Tex. Crim. App. 1928) ("[T]he error of the admission of illegal testimony over objection is not rendered harmless because the accused resorted to rebutting evidence to meet, destroy, or explain the effect of the illegal testimony theretofore admitted.").

We cannot conclude that either of these exceptions apply here. First, the evidence which was the "same or similar" as the improperly admitted evidence was not appellant's testimony; rather, it was the testimony of Gonzalez. Moreover, although defense counsel initially called Gonzalez as a witness, the prosecutor elicited the specific testimony in

24

question from Gonzalez on cross-examination. Because appellant did not offer or elicit the testimony in question, it cannot be said that such testimony was "impelled"[20] by the previous erroneous ruling, and the rationale for the first exception as set forth in *Leday* does not apply. *Cf. Leday*, 983 S.W.2d at 718. Second, Gonzalez's testimony was not offered in order to "meet, destroy, or explain" the evidence which was improperly admitted. *Cf. id.* With respect to the tampering offense in particular, Gonzalez did not provide any testimony which contradicted or rebutted the video recordings or Lopez's testimony. Instead, Gonzalez agreed that appellant confessed to tampering on the video recordings.[21]

For the foregoing reasons, we conclude beyond a reasonable doubt that the trial court's error in denying appellant's motion to suppress did not contribute to the conviction or punishment. *See* TEX. R. APP. P. 44.2(a). Appellant's issue on appeal is therefore overruled.

---

[20] "Impel" is defined as "to urge or drive forward or on by or as if by the exertion of strong moral pressure." MERRIAM-WEBSTER ONLINE DICTIONARY, *Impel*, https://www.merriam-webster.com/dictionary/impel (last visited May 9, 2022) (noting that "*Impel* is very similar in meaning to *compel*, and often a perfect synonym").

[21] We observe that, unlike the tampering offense, Gonzalez's testimony arguably *did* "meet, destroy, or explain" the video evidence of *murder*. *See Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998)*.* In particular, Gonzalez testified that, although appellant admitted that he had a gun and was with Olivarez at the time of the murder, appellant "dissociate[d]" and did not recall pulling the trigger. In this regard, defense counsel's decision to call Gonzalez as a witness may be seen as a legitimate strategic choice—it allowed the jury to hear appellant's version of events (without the risks of cross-examination), but at the same time, it jeopardized his ability to obtain reversal based on the earlier denial of his motion to suppress.

Appellant does not argue that his trial counsel provided ineffective assistance by calling Gonzalez as a witness or by failing to object to Gonzalez's testimony on cross-examination.

### III.     CONCLUSION

We affirm the trial court's judgment.

DORI CONTRERAS
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
12th day of May, 2022.